50 P.3d 1014

**STATE of Idaho, Plaintiff–Respondent,**

v.

**John DOE, Defendant–Appellant.**

No. 27221.

Supreme Court of Idaho,
Boise, February 2002 Term.

July 10, 2002.

Alan E. Trimming, Ada County Public Defender, Boise, for appellant. Lisa D. Schultz argued.

Hon. Alan G. Lance, Attorney General, Boise, for respondent. T. Paul Krueger II argued.

SCHROEDER, Justice.

John Doe, age twelve, appeals his conviction for aggravated battery. Doe is accused of shooting his friend while spending the night at his house. He argues that his Fifth Amendment rights were violated by police interrogation and that the magistrate court admitted hearsay evidence in violation of the Confrontation Clause.

## I.

## FACTS AND PROCEDURAL HISTORY

On June 12, 1999, ten-year-old Nicholas H. and twelve-year-old John Doe were spending the night at Nicholas's home. The boys were playing in Nicholas's older brother's room. Nicholas decided to try to fix a pellet gun that he had been given. Doe noticed a rifle case in the corner of the room. He opened the case and found several rounds of ammunition. He loaded one round into the rifle and began playing with the gun. The gun went off and Nicholas was hit in the neck. He is now paralyzed from the neck down.

Police and emergency personnel responded to the scene. Nicholas was taken to the hospital and Doe was taken to the Boise Police Station. At 3:40 a.m. Detective Todd Dehlin questioned him. The interview was audiotaped. Doe's parents were not present during the interview but were located while the interview was taking place. He was questioned again on June 17, 1999. This interview was also audiotaped. Doe's mother was present at the police station but declined to be present during the interview. Doe ultimately terminated the interview and left with his mother.

On June 18, 1999, Detective Dehlin interviewed Nicholas in his hospital room. Nicholas discussed what he remembered from the night of the shooting and told Detective Dehlin that Doe had shot him.

That day Doe was charged with aggravated battery. A motion to suppress the statements made during the two interviews was denied by the magistrate. The magistrate conducted a court trial and found the charge of aggravated battery to be true. During trial, the magistrate allowed the videotape of Nicholas's interview at the hospital to be admitted into evidence. On January 27, 2000, Doe was committed to the Department of Juvenile Corrections for a period not to exceed his twenty-first birthday. The district court affirmed the magistrate court's decision and order. The district court ruled that the magistrate had abused his discretion in admitting the videotaped testimony but that the error was harmless.

Doe appeals to this Court, arguing that the trial court erred by not suppressing his statements made during the interview with Detective Dehlin and erred by admitting Nicholas's videotaped interview.

## II.

## STANDARD OF REVIEW

■ "In reviewing an order granting or denying a motion to suppress evidence, this Court will defer to the trial court's factual findings unless clearly erroneous. However, free review is exercised over a trial court's determination as to whether constitutional requirements have been satisfied in light of the facts found." *State v. Donato*, 135 Idaho 469, 470, 20 P.3d 5, 6 (2001) (internal citations omitted).

■ A trial court has broad discretion in deciding whether to allow hearsay evidence under IRE 803(24). This Court will not overturn the exercise of the trial court's discretion absent a clear showing of abuse. *State v. Zimmerman*, 121 Idaho 971, 974, 829 P.2d 861, 864 (1992). When a trial court's discretionary decision is reviewed on appeal, this Court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the court reached its decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).

■ When reviewing a district court decision, acting in its appellate capacity, this Court is to review the record and the magistrate's decision independently of, but with

due regard for, the district court's decision. *Walborn v. Walborn,* 120 Idaho 494, 498, 817 P.2d 160, 164 (1991).

## III.

### THE MAGISTRATE DID NOT ERR IN DENYING THE MOTION TO SUPPRESS

■ In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that police must inform individuals of their Fifth Amendment rights prior to conducting "custodial interrogations." To determine whether an individual is in custody, "a court must consider all of the circumstances surrounding the interrogation, with the ultimate inquiry being 'whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *State v. Doe,* 130 Idaho 811, 816, 948 P.2d 166, 170 (Ct.App. 1997) (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279 (1983)(quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977)). This is an objective test, and determined by whether a reasonable person in the suspect's position would understand his or her situation. *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317, 336 (1984).

■ To determine whether a confession is voluntary, the Court looks to the " 'totality of the circumstances' " to determine "whether the defendant's will was overborne." *State v. Radford,* 134 Idaho 187, 191, 998 P.2d 80, 84 (2000). The following factors must be considered in determining whether a confession was voluntary:

(1) Whether *Miranda* warnings were given;

(2) The youth of the accused;

(3) The accused's level of education or low intelligence;

(4) The length of detention;

(5) The repeated and prolonged nature of the questioning; and

(6) Deprivation of food or sleep.

*State v. Troy,* 124 Idaho 211, 214, 858 P.2d 750, 753 (1993)(citing *Schneckloth v. Busta-* *monte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973)).

### June 12, 1999 Interview

■ The State concedes that Doe was in custody for purposes of the June 12, 1999 interview. The State was required to apprise Doe of his Fifth Amendment rights, which Detective Dehlin did. Doe argues that although his *Miranda* warnings were read to him, his waiver of these rights was not voluntary.

■ Detective Dehlin read Doe his *Miranda* warnings, and Doe signed a waiver of these rights prior to being interrogated. An express written waiver of *Miranda* rights is strong proof of a voluntary waiver but is not conclusive proof. Any waiver of *Miranda* warnings must be knowing, intelligent, and voluntary.

■ To determine whether a juvenile has voluntarily waived his *Miranda* rights, a court must consider "the juvenile's age, experience, education, background and intelligence," and "whether he had the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *State v. Doe,* 131 Idaho 709, 712, 963 P.2d 392, 395 (Ct.App.1998)(quoting *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 212 (1979)).

Doe argues that due to his age, experience, lack of sleep, and Detective Dehlin's insistence that he answer questions, that his waiver of his *Miranda* rights was involuntary. However, an examination of the audiotape and the transcript of the interview shows that Doe was aware of the rights he was waiving and that he understood the consequences of his actions.

At the beginning of the interview, Detective Dehlin downplays the importance of the *Miranda* warnings, stating that before he can speak with Doe, he needs to "read ... this little piece of paper." Responding to this, however, Doe replies, "read my rights," and states that he had his rights read to him earlier that day at Juvenile Court. He was at Juvenile Court for yelling at teachers. Detective Dehlin asks Doe: "So, you, you're

familiar with these?" and Doe responds, "Yeah." Detective Dehlin then proceeds to recite the *Miranda* warnings to Doe. He asks Doe if he understands these warnings, and Doe replies "Yeah." Detective Dehlin asks Doe if he has any questions about these rights, and Doe asks, "Am I going to have the Judge and go court and stuff for this?" Detective Dehlin replies, "I don't know. That's why I need to talk to you."

Detective Dehlin finally asks Doe if he wants to talk about the day's events, and Doe responds, "Well, sort of. I don't like talking about it because it hurts me." Detective Dehlin then tells Doe, "You're going to have to answer some questions. Because we're going to have to ask you a few things about what happened, what was there, okay? If you want to talk to me, I just need to have you sign right there." Doe replies "okay" and signs the waiver form. The questioning regarding the shooting then begins.

Detective Dehlin then asks Doe a series of questions about what it means to lie, and tells Doe that he is experienced in being able to tell when a person is lying. He repeatedly tells Doe that he doesn't think that he's a "bad kid" or has a "dark spot" in his heart. When Detective Dehlin suspects that Doe is not being honest, he asks for the "good kid" to come out. Doe's parents finally arrive and shortly thereafter the interview ends.

It is clear that Detective Dehlin does state that the *Miranda* warnings are just a "little sheet of paper." He also states, "You're going to have to answer some questions." However, he carefully recites the warnings to Doe, and Doe makes it clear that he knows what the warnings are, and that they have been read to him before. Taking Doe's age and experience into account, it is clear that he had dealt with law enforcement before. While he was young, he knew what the *Miranda* rights were and understood what they meant.

Another factor is deprivation of food or sleep. The interview occurred at 3:40 a.m., and Doe had been awake since 9 a.m. the previous morning. He told Detective Dehlin that he was tired. However, Doe sounds alert on the tape, and answers all of the questions articulately.

### June 17, 1999 Interview

▮ Regarding the June 17, 1999 interview, Doe argues that his *Miranda* waiver was involuntary and that his mother invoked his right to counsel.

▮ The State argues that Doe was not in custody for purposes of this interview. Doe was not in custody, as the interview itself demonstrates. The interview terminates when Doe states, "You guys are making me mad and I'm about to leave." Doe finally says, "I'm not answering any more," states, "I want to leave," and the interview terminates. Doe leaves by ending the interrogation and is free to go.

Regardless of Doe's custody status, Detective Dehlin read Doe his rights and asked him if he understood them. Doe replied, "Yes." Detective Dehlin asked Doe what the rights mean and Doe replied, "Anything I say, like, anything bad it can be used against me." Detective Dehlin emphasized that Doe "can, at any time, ... decide to remain silent or any of that sort of stuff." Doe then signed the waiver form.

This interview took place five days after the shooting at 12:05 p.m. Doe's mother drove him to the station and remained at the station, although outside of the interview room, the entire time. Detective Dehlin asked Doe's mother if she wanted to be in the interview room with Doe, to which she responded, "No, probably it would be better if I didn't because if I were to sit with him, he would probably get upset because I was in there."

Doe stated that he understood what the *Miranda* rights meant, and in fact exercised them to end the interview. Doe voluntarily waived his *Miranda* rights during the interview.

### Invoking the Right to Counsel

▮ Doe argues that his mother invoked his right to counsel and that the interview should never have taken place. In order to invoke the right to counsel, the suspect's statements must be "clear and unambiguous." *Davis v. U.S.*, 512 U.S. 452, 459,

114 S.Ct. 2350, 2355, 129 L.Ed.2d 362, 371 (1994). A minor's parent may invoke the right to counsel for the child, but that request must also be clear and unambiguous. *U.S. v. Doe*, 60 F.3d 544, 546 (9th Cir.1995).

The magistrate court found that Doe's mother did not make a clear and unambiguous request for counsel. The magistrate court made the following finding:

Even taking the mother's remembrance as completely accurate, she asked about whether she "needed" an attorney for her son, and what she should do since she couldn't afford one. No request for an attorney "on the spot" was made, and Mrs. [Doe] herself drove [Doe] to the interview. She told the detective she didn't want to sit in on the interview because he would talk more freely without her there. This is not an unequivocal request for no questioning unless in the presence of an attorney. In addition, the court notes that [Doe] was interviewed by the same detective five days earlier; the seriousness of the investigation would be self evidence by that date; and that both mother and Detective Dehlin remember talking at some length before the interview took place. Mother certainly had adequate time and notice of the nature of the inquiry and ample opportunity to cease questioning for whatever reason, and did not do so.

Doe's mother asked Detective Dehlin if her son needed a lawyer and told him she could not afford a lawyer. According to Doe's mother, Detective Dehlin told her that if she could not afford a lawyer, she would have to wait until the court appointed her a lawyer. Doe's mother acknowledged that she did not specifically ask for a lawyer. According to her testimony, she stated, "I did not specifically say, 'I want a lawyer with him.' What I specifically said was, 'The *Miranda* rights state that he has a right to one.'"

In fact Doe had already had a public defender appointed on June 11 for a separate case, but Doe's mother had not talked to her yet. Doe's mother's testimony establishes that she knew that Doe had the right to an attorney, and that she never specifically asked for one. She allowed her son to be interviewed by Detective Dehlin alone when she had the opportunity to be present.

There is sufficient evidence in the record to support the magistrate's finding that Doe's mother did not make a clear and unambiguous request for counsel. The decision to deny the motion to suppress is affirmed.

## IV.

### THE MAGISTRATE ERRED IN ADMITTING THE VIDEOTAPED INTERVIEW OF NICHOLAS, BUT THE ERROR WAS HARMLESS

Nicholas was interviewed in his hospital bed six days after the shooting. When he was called to testify at trial, he could not remember many of the events that preceded the shooting. The videotaped interview was then admitted into evidence pursuant to IRE 803(24), which is Idaho's residual hearsay exception.

IRE 803(24) states in relevant part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness.

. . .

(24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can secure through reasonable efforts; and (C) the general purposes of the rules and the interests of justice will best be served by admission of the statement into evidence.

The United States Supreme Court has examined Idaho's residual hearsay exception and ruled that the Confrontation Clause requirements, in addition to the requirements set forth in the rule, must be satisfied before the statement can be used as evidence. *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

The Confrontation Clause of the Sixth Amendment, which is made applicable

in state criminal proceedings through the Fourteenth Amendment, states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." This clause, however, does not operate as a complete bar to out-of-court statements where the declarant is unavailable.

The Confrontation Clause "operates in two separate ways to restrict the range of admissible hearsay." *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597, 607 (1980). "First, ... the Sixth Amendment establishes a rule of necessity.... [T]he prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* Second, if the witness is unavailable, "his statement is admissible only if it bears an adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.* at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 607.

In *Idaho v. Wright*, the United States Supreme Court noted that Idaho's residual hearsay exception is not a firmly rooted hearsay exception. Therefore, in order to be admissible under the Confrontation Clause, the State must show that the out-of-court statement possesses "particular guarantees of trustworthiness." This must be shown from the totality of circumstances. *Wright*, 497 U.S. at 819, 110 S.Ct. at 3148, 111 L.Ed.2d at 654. The relevant circumstances "include only those that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* "[I]f the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial." *Id.* at 820, 110 S.Ct. at 3149, 111 L.Ed.2d at 655.

The magistrate admitted the videotaped statements of Nicholas under the residual hearsay exception. The district court ruled that the statements lacked particularized guarantees of trustworthiness. However, the district court ruled that the error was harmless because the magistrate did not rely on Nicholas's statements in its order. Rather, the evidence used to find Doe guilty was Doe's statements to Detective Dehlin.

Doe argues that Nicholas's statements do not possess particularized guarantees of trustworthiness, and that it was not harmless error to admit the statements. The state's witness, Dr. Edwin Jutzy, testified at trial concerning the state of the victim's memory.

On direct examination Dr. Jutzy was asked about Nicholas's ability to recall the events leading up to the gunshot. He stated that,

his memory is likely to be patchy, and I liken it to Swiss cheese. He has some good solid parts and he has some soft parts of his memory. And the brain never likes a vacuum and the brain will paint a picture of what happened which may or may not be reliable immediately before or immediately after the accident. And so I would really question his memory at any time probably an hour before the accident and maybe a day or two after the accident because of his concussion.

On cross examination he was asked, "in your experience, [is his memory] more reliable six months after an accident than it would be six days after something like this happened?" He responded, "In all fairness, probably neither one is reliable." He then stated: "I think what happens is there's a blank, blank piece of a videotape in his memory loop and he goes back and tries to fill in that with a reasonable story. That's what usually happens. And so memory tends to be more unreliable as time goes by than at the immediate time, but it's hard to say for sure. I think I would have to say it's probably unreliable at both times."

Dr. Jutzy's trial testimony indicates that Nicholas's memory could be faulty. Nicholas's out-of-court statements, even according to the State's own witness, are not reliable. At most, Dr. Jutzy's testimony establishes that Nicholas's memory would be better in the days following the incident than it would be in the months following it. How-

ever, he specifically testified that "neither one is reliable." Nicholas's statements do not contain particularized guarantees of trustworthiness such that cross-examination would be of little utility. Under *Idaho v. Wright,* the only circumstances to be taken into account are those surrounding the making of the statement. Evidence that corroborates the truth of the statement is not to be considered. *Wright,* 497 U.S. at 819, 110 S.Ct. at 3148, 111 L.Ed.2d at 654. The magistrate erred in admitting the videotaped evidence.

### Harmless Error

■ An error that does not affect a defendant's substantial rights is considered harmless and does not require reversal or a new trial. *State v. Slater,* 136 Idaho 293, 32 P.3d 685, 2001 WL 872802, *5 (Ct.App.2001)(citing I.C.R. 52; *State v. Pizzuto,* 119 Idaho 742, 753, 810 P.2d 680, 691 (1991), overruled on other grounds by *State v. Card,* 121 Idaho 425, 825 P.2d 1081 (1991)). "The test for harmless error . . . is whether a reviewing court can find beyond a reasonable doubt that the jury would have reached the same result without the admission of the challenged evidence." *State v. Moore,* 131 Idaho 814, 821, 965 P.2d 174, 181 (1998) (quoting *Giles v. State,* 125 Idaho 921, 925, 877 P.2d 365, 369 (1994)).

■ The magistrate stated that "[w]ithout being exhaustive, these are the key factors in the court's decision," and listed nine factors, which are that 1) Doe had used a BB gun prior to this shooting and was familiar with the safety of that gun, 2) Doe loaded a live round into the .22 in question, 3) he released the breech lock to place the firing pin behind the bullet in a "live" position, 4) he jacked with the safety several times, 5) he admitted pointing at the wall and at Nick "to try to scare him and be cool," 6) he admitted that Nick ducked down from him at least once before he was shot, 7) he admitted pulling the trigger, 8) he admitted knowing that it was a real gun with a real bullet and knew what real guns could do, and 9) he made statements after the shooting that demonstrated knowledge of wrongdoing.

All of the facts recited by the magistrate are contained in evidence outside the videotaped statement. Those facts are established in Doe's testimony. Admission of the videotaped statement was harmless.

## V.

## CONCLUSION

Doe made knowing, intelligent, and voluntary waivers of his *Miranda* rights during both of his interviews. His mother did not make a clear and unambiguous request for counsel. The magistrate court erred by admitting Nicholas's out-of-court statements, but the error was harmless.

Chief Justice TROUT, Justices WALTERS and EISMANN concur.

Justice KIDWELL, Dissenting.

Because the State failed to meet its burden of demonstrating that Doe knowingly, voluntarily, and intelligently waived his *Miranda* rights during the June 12, 1999, interview, I respectfully dissent.

As the majority points out, in order to determine whether a confession was voluntarily given this Court employs a totality of the circumstances test in light of the following factors: (1) whether *Miranda* warnings were given, (2) the youth of the accused, (3) the accused's level of education or low intelligence, (4) the length of detention, (5) the repeated and prolonged nature of the questioning, and 6) deprivation of food or sleep. *State v. Radford,* 134 Idaho 187, 191, 998 P.2d 80, 84 (2000). Additionally, the State bears the burden of proving, by a preponderance of the evidence, that the test has been met. *State v. Maxey,* 125 Idaho 505, 513, 873 P.2d 150, 158 (1994); *State v. Culbertson,* 105 Idaho 128, 130, 666 P.2d 1139, 1141 (1983). In view of the totality of the circumstances surrounding Doe's interrogation, the State failed to satisfy that burden of proof.

In this case, the reading of the *Miranda* form is a neutral factor. Throughout the discussion of Doe's rights during the interrogation, the detective minimized the importance of the waiver document and its contents. The detective premised the entire waiver discussion with the comment, "I just need to read you this little piece of paper

[waiver form].... " The detective worked to persuade Doe that he wasn't involved in a confrontational interrogation, saying, "I'm the nice guy here, [Doe], I'm not, I'm not trying to make things worse or anything like that." Almost immediately after reading the waiver form to Doe, the detective said:

> We're not so sure that he's [the injured friend] going to make it, okay? ... this is serious kind of, this kind of stuff here and *you're going to have, you're going to have to answer* some questions. Because *we're going to have to ask* you a few things about what happened, what was there, okay? If you want to talk to me, I just *need* to have you sign right here.

(Emphasis added). These comments arguably served to dilute any effectiveness that can be attributed to the reading of the form.

The State argues that the following exchange demonstrates that Doe not only understood his rights that early morning, but had knowledge of them prior to that day: The detective said, "I want to talk to you about a couple things that happened tonight.... And I think you probably want to talk to me too. But before I do that, I just need to read you this little piece of paper.... But I need to read it to you, okay?" Doe responded, indicating that the detective was going to "Read my rights." This statement in no way demonstrates that Doe understood the substantive contents of the waiver form. I submit that virtually every twelve-year-old who watches television has a vague notion that upon interrogating a person, the police must "read their rights."

Doe's age—twelve—and his level of education—sixth grade—weigh against a finding of a knowing, voluntary, and intelligent waiver. The State argues, and the lower courts were convinced, that Doe was somehow more sophisticated with regard to the principles of criminal procedure than the average twelve-year-old, because he had previous contacts with law enforcement, having been "read his rights" earlier in the day of June 11. However, that event was a meeting between Doe and a juvenile probation officer, regarding an incident at school in which Doe was "yelling at teachers and stuff." That encounter occurred in a non-confrontational setting, with Doe's mother present, and during the daytime as opposed to the wee hours of the morning. During that encounter, the probation officer used a *Miranda* waiver form that was more simplified than the one later used by the detective, in order to be better understood by juveniles, and which contained a signature line for *both* the juvenile and a parent. The fact that Doe signed the probation officer's waiver earlier in the day of June 11 does not demonstrate that he understood the nature or value of his rights when he signed the detective's waiver early the next morning, or even that he understood his rights when he signed the probation officer's form.

Additionally, when the interrogation began, Doe had been escorted from his friend's residence by uniformed police officers, had spent nearly two hours in police custody, and had not been afforded the opportunity to see or converse with his parents. In fact, although his parents were eventually contacted, Doe knew when the interrogation began that his parents had not been contacted and thus were unaware that he was in police custody. In light of these facts, Doe's relatively young age becomes an even more profound factor weighing against a finding of a knowing, voluntary, and intelligent waiver.

The State points out that Doe answered affirmatively to the following questions: "So, you, you're familiar with these [rights on the waiver form]," "Do you understand those rights," and "Do you want to talk to me about this?" However, Doe's response to the latter was qualified: "Well, sort of. I don't like talking about it because it hurts me." None of these responses can be taken at face value, because this is the point in the analysis at which the sixth factor, regarding deprivation of food or sleep, comes into play. Doe said that he didn't know what day it was, couldn't recall the number of his street address, couldn't recall the year of his birth, couldn't recall his father's work number, demonstrated confusion about his mother's place of work, and demonstrated confusion about his father's work schedule and the fact that the interrogation was taking place approximately ten hours after the time his father's work day was over. Doe said that he

was tired, because he had been awake since 9:00 or 9:30 the previous morning. He offered this information in response to an inquiry by the detective as to whether he was tired, which indicates that Doe actually displayed physical signs of being weary during the interrogation, signs that were perceived by the detective. However, the State argues, and the lower courts were convinced, that Doe seemed alert and lucid, yet "calm, collected, rational and unemotional" during the interview. It is not surprising that a child in Doe's position might display these mixed characteristics, despite being exhausted, considering that he had recently experienced perhaps the most traumatic event of his life—discharging a firearm and wounding a close friend, whom Doe believed might be dying even as he spoke to the detective. The effects of adrenaline, shock, and exhaustion following a traumatic event can be profound.

Clearly, Doe was tired, confused, disoriented, and vulnerable. In sum, the combined effects of Doe's youth, his very minimal experience with law enforcement, the physical and mental trauma of the day's and night's events, and the interrogation conducted inside a police facility without the presence of his parents caused Doe to be incapable of knowingly, voluntarily, and intelligently waiving his rights. Doe's signature on the waiver form and his statement that he understood his rights cannot be taken at face value, given his diminished ability to comprehend the nature of the events that were transpiring. The State failed to demonstrate otherwise by a preponderance of the evidence.

When the record is unclear as to whether a defendant knowingly, voluntarily, and intelligently waived his rights, the burden of proof placed upon the state dictates a result that gives the benefit of the doubt to the defendant, especially when the defendant is a sixth-grade student who has been awake for approximately eighteen hours, has just been through an extremely traumatic ordeal, and who has been sequestered in a police department during the wee hours of the morning without the presence of his parents.

It would send an inappropriate message to law enforcement and would be misaligned with the fundamental constitutional concepts this society holds dear to lower the bar for responsible police conduct when juveniles are involved. On the record as it stands in this case, the statements made during the June 12, 1999, interview should have been suppressed.