## S01A1491. COOK v. THE STATE.
(561 SE2d 407)

HINES, Justice.

Raynard Cook appeals his conviction for felony murder while in the commission of aggravated assault in connection with the fatal shooting of his mother, Josephine Holmes Cook. He challenges the denial of his motion for new trial on the ground that the State failed to provide exculpatory evidence in violation of *Brady*;[1] the admission into evidence of his statements to police; the introduction of evidence of his marijuana use and sale; the admission of evidence "attacking his character"; and the effectiveness of his trial counsel. Finding the challenges to be without merit, we affirm.[2]

Josephine Holmes Cook, a superior court judge, was found dead in her home on October 16, 1996; she had bled to death from a gunshot wound to the back of the right shoulder which had injured the axillary vein. The time of death was determined to be between 6:45 a.m. and 11:45 a.m. on October 16. It was also determined that it would have taken Judge Cook 15 to 45 minutes to bleed to death from the "oozing type injury," and that had she received medical treatment right after the shooting, she would have survived.

At approximately 7:00 on the evening of October 16, seventeen-year-old Raynard Cook went to the home of his neighbor Miller "screaming and hollering" that he needed help because something had happened to his mother. Miller telephoned 911 for emergency assistance. Miller attempted to enter the Cook home but retreated when she saw blood. The evening before, Miller had spoken with the victim by telephone and overheard an exchange between Cook and his mother in which Cook sounded upset. When Miller asked Cook about the incident, Cook replied, "Yes, she's always meddling in my business." Cook and his mother had been having difficulties over his poor grades and his involvement with drugs; Cook had been asked to leave his two previous high schools and had barely passing grades at the school he was then attending.

When police arrived at the Cook house, there was no evidence of

---

[1] *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

[2] The crimes occurred on October 16, 1996. On February 13, 1998, a Fulton County grand jury indicted Cook for malice murder, felony murder while in the commission of aggravated assault, aggravated assault, and possession of marijuana with intent to distribute. The drug charge was severed and the remaining charges were tried before a jury March 16-April 3, 1998. Cook was acquitted of malice murder but found guilty of felony murder and aggravated assault. On April 6, 1998, Cook was sentenced to life imprisonment for the felony murder; the court found that the aggravated assault merged for the purpose of sentencing. A motion for new trial was filed on April 24, 1998, amended on April 25, 2000, and denied on May 7, 2001. A notice of appeal was filed on May 11, 2001, and the appeal was docketed in this Court on July 10, 2001. The case was submitted for decision on September 3, 2001.

forced entry into the home, which was equipped with a security system. An officer saw blood on the foyer floor and a trail of blood and footprints into the great room where the victim's body lay; the victim was clad in a bloody tee shirt and underwear. Bloody footprints led upstairs to the victim's bedroom. There was blood on the bed and on the pillows and a 9 millimeter shell casing at the edge of the bed. There was a bloody handset to a telephone at the entrance to the master suite; the telephone base was hanging off the nightstand. The telephone number pad had blood on the "9" and "1" keys. An emergency medical technician on the scene described the bloody mess as one of the worst he had ever seen; even though the technician wore latex gloves when handling the victim's body, blood got on the technician's hands.

Police later observed damage to the door frame to Cook's bedroom, appearing as if the door had been forced open. Police also found marijuana in a shoebox under Cook's bed and copies of his recent poor grades in his room and on his mother's dresser.

The murder weapon was not recovered but was identified as a Glock 9 millimeter pistol. Cook had purchased a Glock 9 millimeter pistol several weeks before his mother's death.

Cook told police that he left the house between 7:45 a.m. and 8:00 a.m. the morning of the murder; that his mother had kicked in his bedroom door; that he spoke to his mother before he left; that he tried to call her several times throughout the day; that when he came home that evening he found his mother in a pool of blood; and that he cradled her in his arms. Yet none of the investigators or neighbors at the scene saw any blood on Cook.

An investigator on the case testified at trial that Cook's father related that his son told him that he "shot his mother because an unidentified person came into the house with a ski mask on and forced him to shoot his mother."

At trial, Cook took the stand and denied that he shot his mother. He also denied that his mother had kicked in his door and stated that the damage to the doorframe was the result of him and his mother "playing." Cook testified that his purchased 9 millimeter Glock pistol would not fire and acknowledged that if that were shown to be the case, it would support his denial of the shooting. Nonetheless, Cook admitted that he had discarded the weapon and had made no effort to retrieve it to attempt to prove his claimed innocence.

1. The evidence was sufficient to authorize a rational trier of fact to find Cook guilty beyond a reasonable doubt of the felony murder of his mother while in the commission of aggravated assault. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Cook contends that the trial court erred in denying his motion for a new trial because the State failed to provide him with exculpa-

tory evidence of a 911 tape in violation of *Brady*. At issue is a cassette tape copied from an original 911 recording which contained evidence of a telephone call placed from the Cook residence at approximately 6:58 p.m. on the day of the murder. The tape, along with another containing evidence of the 911 call placed about two minutes later from the Miller residence,[3] was discovered post-trial by appellate counsel in reviewing the State's file. However, in order to establish a *Brady* violation, a defendant has the burden of showing that: "(1) the State possessed information favorable to the defendant; (2) the defendant did not possess the evidence nor could he obtain it with due diligence; (3) the prosecution suppressed the evidence; (4) a reasonable probability exists that the outcome of the trial would have been different if the evidence had been disclosed." *Tessmer v. State*, 273 Ga. 220, 225 (6) (539 SE2d 816) (2000); see also *Burgeson v. State*, 267 Ga. 102, 104 (2) (475 SE2d 580) (1996). Cook fails to carry this burden.

The nondisclosure of the tape cannot be found to violate the mandate of *Brady* because Cook has not shown that the tape was exculpatory,[4] and consequently, fails to show a reasonable probability that the outcome of his trial would have been different if the tape had been disclosed.

Cook argues that the tape would have been significant to his defense in undermining the State's attack upon his alibi, which was that he was at school at the time of the shooting. He urges this is so because expert enhancement of the tape disclosed the voice of a female who appeared to be moaning and in distress, and that it must be concluded that the voice was that of Judge Cook; he further argues that inasmuch as the forensic evidence is clear that by the time this first 911 call was logged in, i.e., at approximately 6:58 p.m., Judge Cook had been dead for hours, the time that the call was logged in must have been incorrect and the jury would have been "wavering, unsettled, and unsatisfied" about the time of Judge Cook's death. But the argument is flawed.

First, Cook's assertion that the tape contained the voice of a female in distress, in fact that of his mother, is based on nothing more than speculation and is a distortion of the testimony of the expert that examined the tape. At the suggestion of the trial court hearing the motion for new trial, the District Attorney's office forwarded the tape of the 911 call to the FBI for analysis. The audio enhancement specialist that examined the tape testified that he attempted to isolate a voice of the "so-called caller," but that the

---

[3] Cook does not assert that the nondisclosure of the tape of this second call violated *Brady*.

[4] The trial court expressly found that the tape was "more inculpatory than exculpatory."

improvement was "strictly cosmetic"; that he perceived what he "would call a glimmer of a voice" but had no idea whether it emanated from the Cook household or the 911 center or was a noise that had been picked up during the tape copying process; that he could not make "any conclusive opinions" about the conversation of interest; that "as a layman" he thought that there might be an "utterance" by a female in distress, but that he could be wrong; that he was not a voice comparison analyst or trained in the area of voice identification; and that he had no idea whether the tape contained a voice.

Second, contrary to Cook's assertion, the timeframe of the 911 call was not left in doubt. The evidence adduced at the hearing on the motion for new trial was undisputed that there was no error on the time of recording the 911 call from the Cook residence. Finally, evidence of the 911 call, which was treated as a "hangup" because the call-taker could not elicit an audible response, was consistent with Cook's statements that he attempted to call 911 from his house before going to the neighbor to call for help. Thus, there is no reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Rogers v. State*, 257 Ga. 590, 592 (3) (361 SE2d 814) (1987).

3. Cook gave two statements to police, one on the night of the murder and another six days later, on October 22, 1996. Cook contends that the trial court erred in admitting the October 22 statement because he was not advised of his *Miranda*[5] rights until he had been interviewed for over two hours. But "*Miranda* applies only to statements which result from an in-custody interrogation of the accused." *Hightower v. State*, 272 Ga. 42, 43 (2) (526 SE2d 836) (2000). Accordingly, in order for Cook to show that the admission of his statement was error, he must demonstrate that he was both in custody and was interrogated at the time the statement was made. *Ramsey v. State*, 272 Ga. 28, 29 (2) (526 SE2d 842) (2000). And this he cannot do. The undisputed evidence adduced at the *Jackson v. Denno*[6] hearing showed that Cook was not in custody at the time he made the October 22, 1996 statement.

> Whether a custodial situation exists does not depend upon "the subjective views harbored by either the interrogating officers or the person being questioned." [Cit.] . . . "The only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." [Cit.] In determining whether an accused was in custody when he gave a statement, "a court must examine all of the

---

[5] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).
[6] *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there (was) a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' (Cit.)" [Cit.] "Some suspects are free to come and go until the police decide to make an arrest." [Cit.]

*Hightower v. State,* supra at 43 (2).

Initially, on the night of the murder, the police took a statement from Cook as a background for the investigation because Cook was the last person to see the victim alive. The 17-year-old Cook was accompanied to the police station by his uncle. He was not given *Miranda* warnings at that time because he was not a suspect and he left following his statement. In order to gather further information for the investigation, the police asked Cook to come in and clarify things in his earlier statement and Cook agreed to. On October 22, Cook went to the station accompanied by members of his family. About two hours into the interview, the investigators learned from other sources that Cook had a firearm that was the same make and model as the one used to kill his mother, so at that point, even though Cook was informed that he was not under arrest, an investigator read Cook his *Miranda* rights; Cook executed a waiver of those rights, agreeing to speak with detectives without a lawyer present. Cook was not threatened, coerced, or restrained in any manner, and even though then a suspect, he was not placed under arrest but was free to leave, and he did so. Under these circumstances, Cook was not in custody for the purposes of *Miranda* at any time during the October 22 interview. Id.; *McAllister v. State,* 270 Ga. 224, 228 (1) (507 SE2d 448) (1998).

4. Cook also contends that the trial court erred in admitting into evidence statements[7] he made to police in the October 22, 1996 interview after he had invoked his right to remain silent; he claims that the trial court erroneously determined that he invoked his right to remain silent four pages later in the transcript of the interrogation than was the case, and therefore admitted incriminating statements as evidence, amounting to harmful error.[8] But the cited exchange

---

[7] Cook cites as incriminating statements that he purchased the firearm before his mother's death, that he discarded the firearm after her death, and that he fired the weapon at the park.

[8] The exchange in question was the following:

[COOK]: Somebody killed my mom. I don't want to talk no more today. I don't want to talk no more today. Because I didn't kill my mom, ma'am. I didn't, ma'am.

[DETECTIVE]: You don't want to continue?

[COOK]: No, ma'am. I did not kill my mom, ma'am. I did not kill my mom.

[DETECTIVE]: You want us to believe that?

shows that at that juncture, even though Cook stated that he did not want to continue talking, he did so anyway. Therefore Cook's request to remain silent must be considered equivocal, and the investigator attempted to clarify whether Cook intended to invoke his right to remain silent, as the investigator was authorized to do. *Hatcher v. State*, 259 Ga. 274, 277, n. 2 (379 SE2d 775) (1989). If anything, Cook's initiation of further dialogue with the investigator evinced his intent not to remain silent then. *Larry v. State*, 266 Ga. 284, 286 (2) (a) (466 SE2d 850) (1996). Moreover, any error in admitting the statements at issue must be deemed harmless because the statements were echoed by other independent evidence at trial. Id.

5. Cook fails in his contention that the trial court erred in permitting the State to introduce evidence of his marijuana use and sale in spite of severance of the indicted drug charge, and in refusing to grant a mistrial because of the admission of such evidence. The State connected the evidence of Cook's marijuana use and sale to his motive for murdering his mother; therefore, the evidence was admissible as relevant and material. *Adams v. State*, 272 Ga. 115, 117 (3) (527 SE2d 200) (2000).

6. Cook likewise fails in his contention that the trial court erred in permitting evidence of his difficulties in school "under the guise" of motive, amounting to an attack on his general character. The State presented evidence that Cook's continuing academic problems were some of the cause of the mounting friction between Cook and his mother, and thus, part and parcel of his motive for killing her. *Adams v. State*, supra at 117 (3). And this relevant and material evidence was not rendered inadmissible because it may have incidentally put Cook's character or reputation into evidence. Id.; *Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992).

7. Finally, Cook contends that he received ineffective assistance of trial counsel because counsel failed to investigate and present evidence regarding other reasonable suspects, and such failure contributed to the jury's verdict. In order to prevail on such claim, Cook must show that counsel's performance was deficient and that the deficiency prejudiced him such that a reasonable probability exists that, but for counsel's errors, the outcome at trial would have been different. *Thomas v. State*, 274 Ga. 156, 164 (10) (549 SE2d 359) (2001); *Mobley v. State*, 271 Ga. 577 (523 SE2d 9) (1999), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). Cook does not make this showing.

Cook cites the circumstances surrounding his mother's shooting as indicative of the killer having access to the Cook residence, and

---

[COOK]: I do. I did not kill my mom.

then names as suspects several individuals, including relatives, having such access; he also focuses on the criminal history of one of the individuals and an alleged dispute between another and his mother as demonstrating possibilities as the assailant. But that is all he has done. Cook has failed to present any evidence that the named individuals were viable suspects in the murder. In fact, trial counsel testified that there was no evidence that the person cited as having had a dispute with Judge Cook was at the Cook residence, no evidence of incriminating statements by the person, and no evidence of the making of any threats to Judge Cook; in fact, counsel stated that he had no evidence of any ill will between the individual and Judge Cook. What is more, inasmuch as the State presented evidence that Cook admitted shooting his mother, a decision not to raise the specter of a specific individual as the shooter could reasonably be deemed to be trial strategy.

> And informed strategic decisions do not amount to inadequacy under *Strickland*. [Cit.] "The fact that appellant and his present counsel now disagree with the difficult decisions regarding trial tactics and strategy made by trial counsel does not require a finding that appellant received representation amounting to ineffective assistance of counsel." [Cit.]

*Butler v. State*, 273 Ga. 380, 384 (10) (a) (541 SE2d 653) (2001), quoting *DeYoung v. State*, 268 Ga. 780, 785-786 (5) (493 SE2d 157) (1997). *Judgment affirmed. All the Justices concur.*

DECIDED MARCH 25, 2002.

*Hogue & Hogue, Laura D. Hogue, Franklin J. Hogue*, for appellant.

*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Marc A. Mallon, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Tammie J. Philbrick, Assistant Attorney General*, for appellee.