## S02A0934. FITZ v. THE STATE.
(566 SE2d 668)

THOMPSON, Justice.

Victorino Fitz and six others were charged in an 18-count indictment with multiple felony offenses in connection with the shooting deaths of Manuel Martinez, Darrell Gibbs, and Darreul Johnson.[1] Fitz was tried separately and was found guilty of malice murder, felony murder, aggravated assault, possession of a weapon, and false imprisonment in connection with the shooting death of Martinez; malice murder, felony murder (two counts), kidnapping, aggravated assault, and possession of a weapon in connection with the shooting death of Gibbs; and malice murder, felony murder, aggravated assault, possession of weapon, and false imprisonment, in connection with the shooting death of Johnson. On appeal, Fitz asserts that a warrant to search his home was issued without probable cause, and he challenges the admissibility of his custodial statement. Finding no error, we affirm.

Fitz was dealing drugs from his apartment in the Copeland Road area of Atlanta. He was told by others that a rival drug dealer, Dyral Vire, had hired several people to kill him, including victims Gibbs

---

[1] The crimes took place on March 2-3, 1998. An indictment was returned on July 16, 1999, charging Fitz with malice murder (three counts); felony murder (six counts); kidnapping (three counts); possession of a weapon during the commission of a felony (three counts); and aggravated assault (three counts). Trial commenced on August 8, 1999, and a verdict was returned on August 28, 1999. Fitz was acquitted of two counts of felony murder, and two counts of kidnapping; he was found guilty of all other offenses, including two counts of false imprisonment. Sentencing orders were entered on September 28, 1999; Fitz received three life sentences plus multiple terms of years. A motion for new trial was filed on September 2, 1999, amended on December 15, 2000, and denied on November 29, 2001. A timely notice of appeal was filed on December 13, 2001. The case was docketed in this Court on March 14, 2002, and was submitted for a decision on briefs on May 6, 2002.

and Johnson. As a result, Johnson was brought to Fitz's apartment where he was bound with rope and beaten.

Fitz, armed with a shotgun, located Gibbs nearby and brought him to the same apartment where he was also tied and beaten. Both Johnson and Gibbs denied that they were paid to kill Fitz, each blaming the other. Fitz gave the orders to shoot and kill both men. The two bodies were wrapped in plastic trash bags and were bound with rope. When Fitz was told that the deed was "done," he expressed his approval.

Fitz's accomplices disposed of the two bodies; one was thrown into a ditch near the Chattahoochee River, and the other was dumped near a creek in the same vicinity. Afterward, the collaborators returned to Fitz's apartment.

Meanwhile, Fitz suspected that Martinez was a traitor — until this time Martinez had been an accomplice in the murders of Gibbs and Johnson. Consequently, Fitz ordered that Martinez be killed. But in order to demonstrate his loyalty to Fitz, Martinez offered to kill the rival drug dealer, Vire. Martinez, along with Fitz's accomplices, drove off together in the direction of Vire's apartment, ostensibly to accomplish that purpose. While they were en route, the collaborators carried out Fitz's orders to shoot and kill Martinez. A Polaroid photograph of Fitz was found in Martinez's pocket.

Johnson's body was recovered later that day. A Polaroid photograph of Fitz armed with a shotgun was found adhered to the victim's forehead. The body of the third victim, Gibbs, was discovered in Cobb County.

All three victims had been shot with the same .38 caliber revolver which was recovered from Fitz's apartment during the execution of a search warrant.

The investigation of Martinez's murder led police to Fitz. In a first interview, Fitz told the police that a rival drug dealer was trying to kill him. Fitz identified Martinez as a drug user who had purchased cocaine from him, and he also acknowledged that it was his (Fitz's) photograph which had been found on the body. Two days later, Fitz was interviewed for the second time after the body had been located in Cobb County. Again, he told the police that his life was in danger, and he was given police protection at that time. After a search of his apartment revealed evidence of the crimes, Fitz was arrested, *Miranda* rights were administered, and he told police in a subsequent custodial interview that he ordered the killing of the three victims.

1. The evidence was sufficient under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), for a rational trier of fact to have found Fitz guilty beyond a reasonable doubt of the crimes of which he was convicted.

2. Fitz submits that the search of his apartment was based on an improper, conclusory affidavit which did not provide sufficient basis for a finding of probable cause.

During his initial interviews, Fitz informed the police investigators that that he had moved out of his apartment and was living in a motel because he feared that he was on Vire's "hit list." Fitz consented to a search of that apartment, which proved unproductive. Subsequently, the police were informed by the apartment manager that Fitz was also leasing a second apartment in the same complex, a fact which he failed to reveal in his previous interviews. As a result, a warrant was obtained for the search of the second apartment. In executing that warrant, police found pillows and a bed comforter which appeared to have bullet holes and were stained with blood, blood-stained carpeting, plastic garbage bags, rope, duct tape, the .38 caliber pistol which had been used to kill all three victims, a .38 caliber cartridge, a sawed-off 12 gauge shotgun, and 12 gauge shotgun shells. Fitz challenges the warrant underlying that search.

> A search warrant will only issue upon facts "sufficient to show probable cause that a crime is being committed or has been committed." OCGA § 17-5-21 (a). The magistrate's task in determining if probable cause exists to issue a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." [Cit.] Our duty in reviewing the magistrate's decision in this case is to determine if the magistrate had a "substantial basis" for concluding that probable cause existed to issue the search warrants. [Cit.] A magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court. [Cit.]

*DeYoung v. State*, 268 Ga. 780, 786 (7) (493 SE2d 157) (1997).

The affidavit in issue set forth that Gibbs, Johnson, and Martinez had all been shot numerous times and killed with the same type of .38 caliber handgun; that two of the victims had been wrapped in large plastic bags which had been sealed with tape; that all three victims were known crack addicts who dealt with and purchased cocaine from Fitz; that a photograph of Fitz was found on Johnson's body; that Fitz admitted owning guns and selling narcotics to all three victims; that Fitz advised police he was on a "hit list" of a rival drug dealer and he sought police protection for himself and his family; and

that he nonetheless failed to tell investigators that he leased a second apartment in the same complex. Among the items sought to be seized were weapons, ammunition, blood, rope, tape and garbage bags.

Based on the averments in the affidavit, a neutral magistrate could reasonably have a "substantial basis" for concluding that probable cause existed to issue the search warrant. *DeYoung*, supra at 786 (7).

3. Fitz asserts that his custodial statement should have been suppressed because it was given after he had invoked his right to remain silent and after he had requested an attorney.

A *Jackson v. Denno* hearing was held to establish the admissibility of Fitz's custodial statements. The evidence established that Fitz was arrested and charged with the triple homicides after a search of his second apartment revealed significant physical evidence of the crimes. Because Fitz is not fluent in English, an officer conducted the custodial interview in Spanish. Initially, Fitz was instructed to remain silent until the officer completed administering the *Miranda* warnings. After having his rights read to him in Spanish, Fitz volunteered, "Can I talk now?" But first the officer ascertained that Fitz understood his rights, and then inquired whether he wanted to talk about the three victims. Fitz answered affirmatively and he executed a written waiver in Spanish. When the officer remarked that he wanted to hear the truth, Fitz stated: "Well, the real truth, ah, I have nothing to say to you. If you are going to take me to jail, take me, and best with my attorney. With him I can talk a little better." In order to clarify Fitz's intent, the officer asked, "So then you don't want to talk to us?" Fitz replied: "Well, I have nothing to say to you because simply I am the guilty one and that's it." Again the officer attempted further clarification and told Fitz, "if you want an attorney, you tell me . . . and we'll end now. But if you want to talk to me, if you want to talk to us to see if we can come to the bottom of what happened, we can do that too. But the right that you have is an attorney." Fitz replied, "the real truth, I'm going to tell you the real truth . . . because I am going to talk." Again the officer elicited the response that Fitz wanted to talk "without an attorney," and the interview proceeded, in which Fitz admitted his participation in the three murders.

Fitz's constitutional claims require separate analyses.

(a) *Right to remain silent.*

After twice expressing his intention to make a statement, Fitz was reminded that his responses must be truthful. He replied with an ambiguous statement which may have implicated the right to remain silent. "If the request is equivocal, the police 'may ask questions designed to clarify whether the suspect intended to invoke his

right to remain silent,' but they may not simply continue the interrogation." *Hatcher v. State*, 259 Ga. 274, 277, fn. 2 (379 SE2d 775) (1989). The questions which followed were directed at seeking clarification of Fitz's intentions. Accordingly, the trial court did not err in denying the motion to suppress on Fifth Amendment grounds. See *Cook v. State*, 274 Ga. 891 (4) (561 SE2d 407) (2002).

(b) *Right to counsel.*[2]

Law enforcement officers must immediately cease questioning a defendant who has *clearly* asserted a right to have counsel present during custodial interrogation. *Jordan v. State*, 267 Ga. 442 (1) (480 SE2d 18) (1997), citing *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981). But if the defendant "makes a reference to an attorney that is ambiguous or equivocal, in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," cessation of the questioning is not required. (Emphasis supplied.) *Davis v. United States*, 512 U. S. 452, 459 (114 SC 2350, 129 LE2d 362) (1994).

Assuming that Fitz's statement, "and best with my attorney . . . with him I can talk a little better," was a request for counsel, it was at best ambiguous. Because a reasonable officer would not necessarily have understood Fitz's reference to an attorney to be a clear request for counsel, the officer was not required to cease the questioning on that basis. See *Jordan*, supra. Although the officer had no duty to clarify the ambiguous statement, id., he did so nonetheless. Further questioning by the officer confirmed Fitz's desire to talk without his attorney being present. The trial court did not err in denying the motion to suppress on Sixth Amendment grounds.

*Judgment affirmed. All the Justices concur.*

DECIDED JULY 15, 2002.

*R. Andrew Fernandez*, for appellant.

*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Marc A. Mallon, Elizabeth A. Baker, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Tammie J. Philbrick, Assistant Attorney General*, for appellee.

---

[2] Fitz makes no separate argument on appeal urging an independent State ground, and cites no cases which employ such an analysis. Thus, his claim is analyzed under the Sixth Amendment to the U. S. Constitution. See generally *Taylor v. State*, 177 Ga. App. 624 (3) (340 SE2d 263) (1986).