A04A0422. WALLACE v. THE STATE.
A04A0423. BRADSHAW v. THE STATE.
(600 SE2d 808)

MILLER, Judge.

In a joint trial, Shelton Wayne Wallace and Joel Christopher Bradshaw were found guilty of armed robbery, kidnapping, aggravated assault, and possession of a firearm during the commission of a crime. Following the denial of their motions for new trials, Wallace and Bradshaw appeal. Wallace seeks to contest three evidentiary rulings and the denial of his motions to sever defendants and to sever offenses. Bradshaw contends that the trial court erred in admitting his custodial statement and allowing a surveillance videotape into evidence. He also claims that the State failed to carry its evidentiary burden on his motion to suppress the evidence seized from his apartment. After review, we find no error and affirm in both cases.

Viewed in the light most favorable to the verdict, the evidence shows that on March 26, 2001, Wallace entered a Super H convenience store, where he pointed a small silver handgun at the store manager. Wallace, described as an older white man with a gray beard and mustache, was not wearing a mask and did not otherwise conceal his face. Wallace threatened to kill the manager if she did not give him all the money in the register. After she complied, Wallace demanded

that she give him all of the money in a second register. That register, however, was empty because it was used only on Fridays to cash payroll checks for local businesses. She repeatedly explained to Wallace that because it was not a Friday, the second register had no money. Wallace then ordered her to lie down on the floor, warning her that if she got up within the next five minutes, he would kill her.

While the armed robbery was in progress, a customer drove into the Super H parking lot and noticed a black king cab truck parked outside. The customer did not see the truck leave, testifying that it was gone by the time she finished pumping her gas. Investigators determined later that the wife of Bradshaw, Wallace's co-defendant, owned a black Ford extended cab truck.

Three days after the Super H robbery, Wallace and Bradshaw robbed a Kuntry Korner convenience store. This time Wallace and Bradshaw entered the store together. Again, Wallace did not conceal his face. Bradshaw, however, wore a bandanna around the bottom of his face, leaving the upper portion of his face unconcealed. At gun-point, Wallace ordered everyone in the store down to the floor. Pointing a silver handgun directly at the cashier behind the counter, Wallace demanded all the money. While the robbery was in progress, the store owner came out of the bathroom where he had been mopping. The owner recognized Bradshaw, whom he knew as "Joel." Complying with the demand, the cashier emptied the money from the register into a white plastic grocery bag. Wallace then ordered the cashier to the other register, where then Kuntry Korner kept funds to cash checks. Wallace and Bradshaw forced everyone in the store into a back room, the location of the second register. In all, Wallace and Bradshaw stole approximately $20,000.

Kuntry Korner's surveillance camera videotaped the entire incident. A customer at Kuntry Korner at the time of the robbery testified that while he was standing at the checkout counter, two men entered the store behind a "delivery guy." The customer noticed that the man with the gun "didn't have his face covered, didn't have a mask." He testified that the gunman ordered everyone into the back room, the delivery man, the cashier, himself, and the store owner. The customer testified that while inside the back room, "we could see them leaving, actually leaving the store through the video monitor." A few days later, from a photo array, the customer identified Wallace as the gunman. He testified that Wallace was the gunman in the Kuntry Korner armed robbery who had forced him and the others to move into the back room.

Following up on leads, investigators apprehended Wallace and Bradshaw in late March. While executing a search warrant at the apartment of Wallace and Bradshaw, officers found several money wrappers, some of which bore date stamps from the same bank used

by Kuntry Korner. Investigators also found a blue windbreaker, and a blue hat that closely resembled clothing worn in the Kuntry Korner robbery. Police also found several bank wrappers in a white plastic bag. Inside Bradshaw's black pickup truck, investigators found a roll of coins, a loaded silver handgun in the center console, a black Ford racing hat, a flannel type jacket, and a rebel flag bandanna, items that resembled ones seen in the videotape.

Victims from both robberies testified that the silver handgun resembled the gun used against them. From a photographic array and later in court, the store manager at the Super H identified Wallace as the gunman. Other evidence showed that shortly after the armed robbery of the Kuntry Korner, Bradshaw bought a 1996 red Chevrolet truck, paying $2,500 down in $100 bills, and on the following day, Bradshaw opened a bank account with a $3,000 cash deposit. When booked, Bradshaw had $2,900 in cash on his person.

The store owner identified Bradshaw at trial as the second robber, explaining that he recognized Bradshaw because "he was one of our customers." He testified that when Bradshaw worked at the nearby landfill, he had cashed his paychecks at the Kuntry Korner 12 or 13 times. The surveillance video from Kuntry Korner was viewed by the jury.

## Case No. A04A0422

1. Wallace contends that the trial court erred in allowing the videotape of the Kuntry Korner robbery into evidence. He asserts that the trial court ignored the plain and unambiguous terms of OCGA § 24-4-48 (c), which terms address the foundational requirements for videotapes created by unmanned cameras.

As alleged in the indictment, the armed robbery and the other crimes committed at the Kuntry Korner occurred on March 29, 2001. The videotape, however, displayed the date of the events as Wednesday, August 1, 1996. Based on that discrepancy, Wallace claims that by admitting the surveillance videotape, the trial court failed to apply subsection (c), which requires that "prior to the admission of such evidence the date and time of such . . . videotape recording shall be contained on such evidence and such date and time shall be shown to have been made contemporaneously with the events depicted in the . . . videotape."

Wallace overlooks the fact that subsection (d) expressly provides that OCGA § 24-4-48 "shall not be the exclusive method of introduction into evidence of . . . videotapes . . . but *shall be supplementary* to any other statutes and lawful methods existing in this state." (Emphasis supplied.) Even when an appropriate witness under OCGA § 24-4-8 is unavailable to authenticate such evidence, "a videotape is

admissible where the operator of the machine which produced it, or one who personally witnessed the events recorded testifies that the videotape accurately portrayed what the witness saw take place at the time the events occurred." *Phagan v. State*, 268 Ga. 272, 281 (5) (486 SE2d 876) (1997).

Here, the cashier as well as others who personally witnessed the events, authenticated the surveillance videotape. One of the customers identified himself on the videotape. In addition, the cashier testified that only he was responsible for inserting and removing the tapes, a task that he performed daily. He explained that the store had a different tape for each day of the week and that every night at closing time, approximately 9:30 p.m., he would start a tape that would record continuously over the next 24 hours. The cashier recognized his writing on the tape and admitted that he did not know how to set the date and time on the VCR. He avowed that he had not made any additions, changes, or erasures to the tape and identified himself and the owner on the videotape. Also, the owner testified that the surveillance film accurately reflected the events of March 29, 2001. He further testified that he had never before been robbed and had not owned the store in 1996. There was no error. See *Hudson v. State*, 273 Ga. 124, 127 (3) (538 SE2d 751) (2000).

2. Wallace claims that the trial court erred in denying his motion to sever the trials of the defendants. He contends that despite the redaction of all references to him, the introduction of Bradshaw's statement over objection connected him to Bradshaw and "was highly prejudicial."

Whether to grant a motion to sever defendants for trial is within the discretion of the trial court. See *Green v. State*, 274 Ga. 686, 687 (2) (558 SE2d 707) (2002). In making that determination, a trial court should consider:

(1) whether the number of defendants will confuse the jury as to the evidence and the law applicable to each defendant; (2) whether, despite cautionary instructions from the court, there is a danger that evidence admissible against one defendant will be improperly considered against another defendant; and (3) whether the defenses of the defendants are antagonistic to each other or to each other's rights of due process.

(Footnote omitted.) Id. at 687-688. "It is incumbent upon the defendant who seeks a severance to show clearly that he will be prejudiced by a joint trial, and in the absence of such a showing, the trial court's denial of a severance motion will not be disturbed." (Footnote omitted.) Id. at 688 (2). Even when the evidence of one defendant's guilt is

stronger than that against the other, it is not error to deny a severance when there is evidence that the defendants acted in concert. *Strozier v. State*, 277 Ga. 78, 81 (5) (b) (586 SE2d 309) (2003).

Here, Wallace made no showing of confusion of the law or evidence. Nor did Wallace establish that the evidence introduced against Bradshaw was improperly considered against him. Wallace and Bradshaw jointly participated in the armed robbery of the Kuntry Korner. Wallace brandished the gun while Bradshaw stood nearby. Witnesses testified that it was Wallace who pointed the gun, demanded money, and threatened to kill anyone who did not follow his instructions. Therefore, Wallace failed to sustain his burden of showing prejudice. See *Green*, supra, 274 Ga. at 688 (2).

3. Wallace asserts that the trial court erred by failing to sever the offenses for trial. He claims that the two robberies occurred on different dates and different locations and that one involved an accomplice and the other did not. He argues that the two armed robberies were separate and distinct and did not involve the same victims.

"If the charges are joined solely because they are of the same or similar character, a defendant has an absolute right to sever." (Citations omitted.) *Stewart v. State*, 277 Ga. 138, 139 (587 SE2d 602) (2003). "Where, however, as here, joinder is based on a series of acts connected together, severance lies within the sound discretion of the trial court." (Citations omitted.) *Bland v. State*, 264 Ga. 610, 611 (2) (449 SE2d 116) (1994).

The Super H and Kuntry Korner robberies were closely linked by date and place and indicated a common plan, scheme, and modus operandi. See *Dobbs v. State*, 199 Ga. App. 793 (1) (406 SE2d 252) (1991). In each, an older man with a gray beard entered a convenience store, brandishing a silver handgun. He immediately began demanding money and threatening to kill anyone who did not cooperate. In both incidents, the gunman did not conceal his face. In both, he made a concerted effort to obtain funds specially set aside for cashing local payroll checks. Escape was by means of a black extended cab pickup truck. The incidents occurred less than three days apart, in the same general area, and in the same manner. See *Evans v. State*, 188 Ga. App. 379 (1) (373 SE2d 70) (1988). The two armed robberies formed part of a continuing course of conduct or constituted a series of connected acts. See *Hubbard v. State*, 275 Ga. 610, 611 (2) (571 SE2d 351) (2002). Although the jury acquitted Bradshaw of being a party to the crimes committed at the Super H, the State offered evidence of his involvement. The trial court did not abuse its discretion in denying the motion to sever.

4. Wallace contends that the trial court erred by allowing the introduction of Bradshaw's statement at trial. He complains that

even though his "co-defendant's confession" was redacted, "it [was] clear that someone else was involved," and he "was the only other suspect in the courtroom."

After his arrest, Bradshaw provided a statement to Sergeant Lewis Rusgrove that was audiotaped. Bradshaw implicated Wallace and discussed Wallace's role. The jury, however, heard only a redacted version of Bradshaw's statement that eliminated any mention of Wallace or another person's involvement.

The constitutional principles enunciated in *Bruton v. United States*, 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968), apply to a statement of a co-defendant that inculpates the defendant. *Brown v. State*, 260 Ga. App. 77, 78-79 (1) (b) (579 SE2d 87) (2003). In order "[f]or the admission of a co-defendant's statements to constitute a *Bruton* violation[,] the statements *standing alone* must *clearly inculpate* the defendant." (Citation and punctuation omitted; emphasis in original.) *Thomas v. State*, 268 Ga. 135, 137 (6) (485 SE2d 783) (1997). Here, Wallace made no such showing.

5. Wallace contends that the trial court erred by failing to suppress evidence obtained during a search of his apartment. He asserts that the investigating officer had no evidence at the time of the search that he or Bradshaw lived there other than information obtained from an unidentified driver and his passenger who happened to drive by the parking lot. Wallace claims that the officer did not know these persons or their degree of reliability as informants.

"A magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court." (Citation omitted.) *Fitz v. State*, 275 Ga. 349, 351 (2) (566 SE2d 668) (2002).

> The magistrate's task in determining if probable cause exists to issue a search warrant is simply to make a practical, common-sense decision whether, given all the circumstances set forth . . . before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

(Citation and punctuation omitted.) *DeYoung v. State*, 268 Ga. 780, 786-787 (7) (493 SE2d 157) (1997).

At the suppression hearing, the investigator who procured the search warrant for the apartment testified that the application was based "on numerous facts that I discovered during my investigation." His affidavit set forth a highly detailed factual basis for the search warrant, describing, among other things, that both armed robberies were committed by an older white male with gray hair and a gray

beard, using a silver or chrome-colored pistol and seen leaving both stores in a black pickup truck. The affidavit stated that the armed robbery of the Kuntry Korner also involved a second suspect "described as a white heavy set male, wearing a plaid type outer garment, black in color hat, rebel flag bandanna across the face, and dark hair." The affidavit noted that the "subjects were seen arriving and leaving in a black Ford Ranger pickup truck with an extended cab and tinted windows," and that video devices had recorded the subjects and their truck. The affidavit further related that on March 30, 2001, detectives with the City of Monroe Police Department noted a truck matching that description parked in front of Building 406 at the Ashton Pointe Apartments and saw two men leave that truck and enter a red Chevy pickup truck, and that "[t]hese two males strongly resembled the two suspects of the [Kuntry Korner] armed robbery." The black Ranger was registered to Rhonda Bradshaw, the wife of Bradshaw, "a white male who strongly resembled the heavy set male." In addition, the affidavit stated that Bradshaw's former employer told investigators that the man in the surveillance video strongly resembled Bradshaw; the black truck in the video looked like the one that Bradshaw owned; and that Bradshaw was known to carry a rebel flag bandanna.

Based on the averments in the affidavit, a neutral magistrate could reasonably have found a substantial basis for concluding there was probable cause to issue the search warrant. See *Fitz*, supra, 275 Ga. at 352 (2).

### Case No. A04A0423

6. Bradshaw contends that he was denied a fair trial as a result of the admission of his custodial statement. He claims that his waiver of rights was not knowingly or willingly made within the meaning of *Jackson-Denno*. Bradshaw argues that the State failed to rebut his testimony at the *Jackson-Denno* hearing that he was intoxicated and "drugged up" on Loritab, Xanax, and liquor. At the *Jackson-Denno* hearing, Bradshaw also testified that he could not recall the interview and did not understand the reading of his rights.

In determining the admissibility of a statement, a trial court must find by a preponderance of evidence that the statement was made knowingly and voluntarily. *Fuller v. State*, 262 Ga. App. 656, 657 (2) (586 SE2d 359) (2003). Unless clearly erroneous, factual and credibility determinations made at a *Jackson-Denno* hearing must be accepted by appellate courts. *Cameron v. State*, 187 Ga. App. 562 (1) (370 SE2d 812) (1988).

Here, the trial court heard Bradshaw's testimony as well as that of the arresting officer, who testified that he had advised Bradshaw

of his rights and that Bradshaw signed a waiver. The officer denied making any threats or promises, and stated that Bradshaw did not appear to be under the influence of alcohol. The custodial interview was taped and transcribed and the record contains a copy of the waiver form that Bradshaw signed. The court heard the conflicting testimony, including testimony about Bradshaw's intoxication, and found that Bradshaw was properly advised of his constitutional rights and that his statement met the criteria for admission. Having read the transcript of the custodial interview and considered the testimony bearing on this issue, we cannot say that the trial court clearly erred in admitting the statement as redacted. See *Christopher v. State*, 269 Ga. 382, 383 (2) (497 SE2d 803) (1998).

7. Bradshaw asserts that he was denied a fair trial because the court admitted his custodial statement despite a violation of his right to counsel under *Miranda*. He claims that the interrogating officer did not advise him of his rights until more than seven hours after his arrest and nearly a third of the way into the interview. He contends that despite making several requests for a lawyer, the investigating officer continued questioning him.

In reviewing a trial court's factual findings on the admissibility of a custodial statement, we use the clearly erroneous standard of review. *Pollard v. State*, 238 Ga. App. 253, 256 (4) (518 SE2d 463) (1999). "Whether a defendant waives his rights under *Miranda* and makes a voluntary and knowing statement depends [upon] the totality of the circumstances." (Citation and punctuation omitted.) Id.

Here, the transcript indicates that the officer obtained preliminary information, such as Bradshaw's education, mailing address, age, Social Security number, and place of employment, before advising Bradshaw of his rights. The trial court decided to exclude all of Bradshaw's remarks made before he was advised of his *Miranda* rights. In allowing the remainder of the statement, the court noted the absence of any significant difference between Bradshaw's testimony at the suppression hearing and his recorded statement.

As to the issue of whether Bradshaw invoked his right to counsel during the custodial interview, we find that he did not. While vouching for his own innocence, Bradshaw said, "If I got to get an attorney, a lawyer, I will get a attorney." Later, the arresting officer pointed out the $3,000 deposit to his checking account, his down payment on the truck, his recent purchase of new tires, and the $2,900 that he had at arrest despite the fact that he had missed a week of work. The officer said, "You can't come up with all that money, Joel, just. . . ." Bradshaw retorted, "I got, I got —, I got proof, I got, I get a lawyer." The officer asked Bradshaw if he wanted to stop talking and end the interview. Bradshaw gave no such indication. Bradshaw then inquired about a bond, saying, "Well, I'm, I'm askin you a question. I wanna, I wanna

know somethin, I wanna know when (n/a) set me a bond to get out. . . ." He then added, "I wanna go to a lawyer."

"A suspect must make a clear and unambiguous request to have counsel present *during* a custodial interrogation to require law enforcement officers to stop their questioning." (Footnote omitted; emphasis supplied.) *Moore v. State*, 272 Ga. 359, 360 (2) (528 SE2d 793) (2000). At most, Bradshaw's comments indicate an intention to speak with a lawyer in the future and do not constitute a clear request for counsel. See id. Therefore, the officer was not required to cease questioning Bradshaw.

8. In two closely intertwined claims of error, Bradshaw contends that he was denied a fair trial as a result of the admission of the improperly redacted audiotape of his custodial statement that impermissibly introduced his character in evidence.

Bradshaw's counsel wanted the jury to hear the audiotaped statement with the same portions redacted as in the written transcript of that statement. Bradshaw now complains that in the redacted version of the audiotape he seems to say that he "got [his] gun, covered up [his] face and went into the store."

Prior to the admission of the audiotape, the prosecutor expressed concern about being able to properly edit the audiotape to redact the objectionable portions. The next morning, having made the redactions, the prosecutor said:

> I can cue it up at the beginning of the "okay, I'm going to advise you of your rights" part, but neither of the defense attorneys have had the opportunity this morning to hear the redacted version to be sure that it's acceptable to them. I know what it is; I've listened to it four times. But they don't. So I think we need to get that housekeeping matter out of the way before we bring in the jury.

Wallace's counsel expressed interest in hearing a portion of the tape to ascertain how noticeable the redactions were and that was done. But neither defense counsel expressed any interest in hearing the entire audiotape.

Later, after the jury heard the audiotape, Bradshaw's counsel requested a bench conference to object to the tape on an unrelated issue, i.e., the fact that Bradshaw said, "he's going to file bankruptcy," but counsel did not object on the basis now being asserted. After the redacted version of the audiotape was played, defense counsel had the interrogating officer admit that the tape "wasn't the entire and complete tape." Counsel then asked the officer, "So when my client said in that tape — if that was my client — that he covered his face and went out to the truck and got a gun, that couldn't be, could it?

That's an impossibility, isn't it, sir?" The officer took issue with counsel's question, testifying that while Bradshaw did say that "he covered his face and went into the store," he did not say that he got the gun or took the gun in the store.

After Wallace objected on the basis of *Bruton*, Bradshaw moved for a mistrial, arguing that the tape said: "covered up my face, got up in my truck, and looked in the console and got a gun." Claiming that the redaction mischaracterized the custodial statement, he argued, "it's plain. It almost knocked my ears off when I heard it." After pointing out that defense counsel had extracted the comment from its proper context, the State argued the issue was waived. The prosecutor observed, "It's not my fault that nobody listened to the tape. I was here at 8:00 this morning, like I told everybody I'd be here, with the tape."

By failing to avail himself of the opportunity to listen to the tape before the jury heard it and by failing to interpose a timely objection, Bradshaw waived this issue. See *Garey v. State*, 273 Ga. 133, 135 (1) (539 SE2d 123) (2000). Any surprise in the redacted tape was self-induced. See id. at 136. In any event, the testimony of the robbery victims, the surveillance tape, and the photographs derived from the surveillance tape clearly indicated that only one man had a gun, the older gray haired man, not Bradshaw.

9. In two separate claims of error, Bradshaw contends that the trial court erred in admitting the surveillance videotape. He asserts that the State failed to establish a proper foundation and that by allowing such evidence the trial court abused its discretion by violating the clear and unambiguous language of OCGA § 24-4-48 (c). As discussed in Division 1, an audiotape or videotape can be properly authenticated, as here, by a party to the incident so recorded. *Hudson*, supra, 273 Ga. at 127 (3). There was no error.

10. Bradshaw contends that he was denied a fair trial as a result of the trial court's error in admitting evidence seized pursuant to a search warrant for the Ashton Pointe Apartments. He asserts that the State failed to carry its evidentiary burden at the hearing on the motion to suppress. He claims that the State "was given an unfair advantage to be able to produce evidence without the Appellant having the same extended opportunity to cross-examine the evidence."

At the suppression hearing on October 22, 2001, an investigator and sergeant testified that the case involved three search warrants: one from Walton County for the apartment because it was located in Walton County; and two warrants for the black Ford Ranger truck, one from Walton County and another from Barrow County. After the State conceded that it did not have the original or a certified copy of the warrant from Walton County, the trial court announced, "I'm

going to permit the State to supplement the record in this hearing by the introduction of the certified copy of the search warrant and affidavit from Walton Magistrate Court." Neither Wallace nor Bradshaw objected. The transcript from a subsequent hearing held in February 2002 contains a certified copy of the Walton County search warrant and the application.

Nearly eight months after acquiescing to the supplementation of the record, and after the trial court determined that the evidence obtained pursuant to the warrant in question would be admissible, Bradshaw's counsel objected on June 3, 2002, stating, "I did not agree to allow [the State] to produce the search warrants at a later date. . . ." Counsel claimed, "I was denied that ability to cross-examine that evidence, and, as such, there's certain harm that attaches." After noting that it had permitted the State to reopen the evidence to introduce the search warrant and the application, the trial court then reopened the motion to suppress to afford defense counsel an opportunity to fully cross-examine the investigator about the warrant. Thereafter, the trial court denied the motion to suppress. Even assuming for the sake of argument that this issue was not waived, the record belies Bradshaw's claim that he was deprived of an opportunity to confront and cross-examine witnesses about the contents of the supporting affidavit. Cf. *Gates v. State*, 229 Ga. App. 766, 768-769 (b) (495 SE2d 113) (1997).

*Judgments affirmed in Case Nos. A04A0422 and A04A0423. Andrews, P. J., and Ellington, J., concur.*

DECIDED JUNE 14, 2004.

*Benjamin C. Free*, for appellant (case no. A04A0422).
*William H. Kitchens, Jr.*, for appellant (case no. A04A0423).
*Timothy G. Madison, District Attorney, Jennifer M. Taylor, Dylan E. Wilbanks, Assistant District Attorneys*, for appellee.