821 A.2d 439

STATE of Maryland,

v.

Terrence Michael RUCKER.

No. 28, Sept. Term, 2002.

Court of Appeals of Maryland.

April 14, 2003.

200

Gary E. Bair, Solicitor General (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for petitioner.

Christopher Allen Griffiths (Douglas J. Wood of Roberts & Wood, on brief), Riverdale, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, JJ.

BATTAGLIA, Judge.

Based on a tip provided by a confidential source that respondent Terrence Michael Rucker (hereinafter "Rucker") was involved in narcotics trafficking, police stopped and questioned him in a shopping center parking lot. As Rucker was stepping into his vehicle, a uniformed officer parked his patrol car behind it, approached Rucker, and asked for his license and registration. Rucker complied, and within moments, two

more officers appeared. One of those officers asked Rucker whether "he had anything he was not supposed to have." Rucker stated that he did, and upon further inquiry, admitted to having cocaine. After the police found cocaine on Rucker, he was arrested and charged with possession of a controlled dangerous substance with intent to distribute and other offenses. Prior to trial, Rucker moved to suppress his statements and the evidence derived therefrom, arguing that police should have read him *Miranda* rights before making their inquiries. Although the suppression court and the Court of Special Appeals agreed, we do not. We hold that because Rucker was not in "custody" for purposes of *Miranda* when he was stopped and questioned in the shopping center parking lot, his admissions should not be suppressed for his not having received the prescribed warnings. Consequently, we shall reverse the judgment of the Court of Special Appeals and remand for further proceedings.

## I. Background

Two witnesses testified at the suppression hearing in the instant case: Detective Melvin Powell and Corporal Anthony Grimes, both from the Prince George's County Police Department. According to Detective Powell, on December 31, 2000, a confidential source informed him that the source knew of several persons, including Rucker, who were distributing crack cocaine in the Capitol Heights and Forestville areas of Prince George's County. The source described Rucker as "dark complected, about six foot tall, a hundred and eighty-five pounds, [with] a short hair cut." The source also told Detective Powell that Rucker "owned a burgundy Tahoe" and provided the detective with a "a partial tag of the Tahoe." In addition, the source told Detective Powell that on January 2, 2001, Rucker would be at a shopping center in Forestville at 5:20 in the evening, that he would be driving the burgundy Tahoe, and that he would be carrying "a quantity of crack cocaine." Consequently, Detective Powell, the source, and a fellow detective by the name of Piazza drove to the shopping center.

Shortly after Detectives Powell and Piazza, and the source arrived at the shopping center, Detective Powell spotted a burgundy Tahoe parked "in front of the Athletic USA store, exactly where the confidential source said it would be." About three minutes later, Detective Powell saw an individual approaching the vehicle, who was identified by the source as Rucker. Detective Powell then contacted Corporal Grimes, who was in the vicinity in his patrol car, and asked the Corporal to stop Rucker.

Corporal Grimes parked his patrol car behind the burgundy Tahoe. There was no vehicle occupying the space in front of the Tahoe at the time. As Rucker was getting into the driver's side of the Tahoe, Corporal Grimes called to him in an attempt to get his attention, walked up to him, and requested Rucker's license and registration. Rucker asked, "what's going on," the Corporal just repeated his original request, and Rucker subsequently complied. Corporal Grimes was uniformed and armed, but his weapon was not drawn, and he "made no physical contact with" Rucker.

After Rucker gave his license and registration to Corporal Grimes, Detectives Powell and Piazza arrived. Detective Powell "walked right up" to within two feet of Rucker "and started asking him questions." Detective Piazza, who was "maybe a step behind" Detective Powell and Corporal Grimes, although still in the immediate area, had stepped away from Rucker. Detective Powell asked Rucker "if he had anything that he was not supposed to have." Rucker responded, "[Y]es, I do, it's in my pocket." Detective Powell asked what it was, and Rucker responded, "cocaine." Detective Powell testified that he then placed Rucker in the "prone" position against the Tahoe and eventually recovered "two large rocks of cocaine" from Rucker's pocket. Rucker then was placed formally under arrest. "[T]he entire incident ... from the time we picked up the source," according to Detective Powell, lasted no more than one hour.

After hearing the officers' testimony and argument from counsel, the Circuit Court granted Rucker's motion to sup-

press his statements and the tangible evidence found during the search of his person. In an oral opinion, the judge observed that "everybody concedes, both from the State and defense side, that there was no probable cause to arrest Mr. Rucker unless one takes into account his statements" and made the following detailed findings of fact:

Detective Grimes was not involved in the case directly. He was summonsed to the scene to go ahead and make a stop.... I use the word stop because clearly that's what happened; he confronted Mr. Rucker as Mr. Rucker was getting into his vehicle, asked him to basically step outside, regardless of how it's stated, provide license and registration. And as Detective Powell testified, that was apparently being done when Detective Powell approached the defendant. Detective Rucker we know-or Detective Powell has testified, as did Officer Grimes, that Officer Grimes was in uniform at the time and clearly one can assume, although it's not testified to, that he was armed at the time, albeit, we know nobody had drawn a weapon.

While Detective—Officer Grimes had the defendant in his presence, Detective Powell approached the defendant, and at this point in time says something to the effect do you have something on your person that you're not suppose to, at which point in time the defendant said yes. And we know from this point, forward the defendant's person was seized after he confided that he had cocaine on his person.

Based upon those findings, the judge determined that the "detention of Mr. Rucker for all intents and purposes" was "an arrest" and concluded that "there was no basis for Detective Powell to go up to the defendant's person and start making inquiry without first mirandizing him."

The State filed an interlocutory appeal pursuant to Maryland Code, § 12–302 of the Courts and Judicial Proceedings Article (1973, 1998 Repl.Vol.),[1] and the Court of Special Ap-

---

1. Section 12–302 provides in pertinent part:

peals affirmed in an unreported opinion. Although the intermediate appellate court determined that the police had initiated a valid *Terry* stop because they "had a reasonable articulable suspicion to stop appellee" based on the information provided by the confidential source, it also concluded that "what occurred after the stop changed the character of the event." According to the Court of Special Appeals, "[T]he events in the shopping mall parking lot exceeded an investigatory stop under *Terry*, and became the functional equivalent [to] a *de facto* arrest," requiring *Miranda* warnings.

We granted the State's Petition for Writ of Certiorari, 369 Md. 301, 799 A.2d 1262 (2002), to consider the following question:

Where the police very briefly detained Rucker on a public street without any display of force, should the Court of Special Appeals' decision, which found "the functional equivalent of a de facto arrest" for purposes of *Miranda* and accordingly affirmed the grant of Rucker's suppression motion, be summarily reversed in light of this Court's opinion in *In re David S.*, 367 Md. 523, 789 A.2d 607 (2002)?

(c) In a criminal case, the State may appeal as provided in this subsection.

\* \* \*

(3) (i) In a case involving a crime of violence as defined in § 643B of Article 27, and in cases under §§ 286 and 286A of Article 27, the State may appeal from a decision of a trial court that excludes evidence offered by the State or requires the return of property alleged to have been seized in violation of the Constitution of the United States, the Constitution of Maryland, or the Maryland Declaration of Rights.

(ii) The appeal shall be made before jeopardy attaches to the defendant. However, in all cases the appeal shall be taken no more than 15 days after the decision has been rendered and shall be diligently prosecuted.

(iii) Before taking the appeal, the State shall certify to the court that the appeal is not taken for purposes of delay and that the evidence excluded or the property required to be returned is substantial proof of a material fact in the proceeding. The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court. Otherwise, the decision of the trial court shall be final.

For the reasons set forth herein, we hold that Rucker was not in custody for purposes of *Miranda* when he was stopped and questioned in the shopping center parking lot and so was not entitled to the procedural warnings prescribed by that case. Consequently, we shall reverse the judgment of the Court of Special Appeals and remand for further proceedings.

## II. Standard of Review

 Our review of an order granting a motion to suppress evidence is ordinarily "limited to the evidence presented at the suppression hearing." *Carter v. State,* 367 Md. 447, 457, 788 A.2d 646, 651 (2002)(citing *Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491, 497 (1999)). In conducting our analysis, we view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion, which in this case, was Rucker. *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519, 525 (2000). We pay deference to the trial court's factual findings, upholding them unless "they are clearly erroneous." *Carter,* 367 Md. at 457, 788 A.2d at 651–52 (citing *Wengert v. State,* 364 Md. 76, 84, 771 A.2d 389, 394 (2001)). "[We] must make an independent constitutional evaluation," however, "by reviewing the relevant law and applying it to the unique facts and circumstances of the case." *Carter,* 367 Md. at 457, 788 A.2d at 651 (citing *Wilkes v. State,* 364 Md. 554, 569, 774 A.2d 420, 429 (2001); *Stokes v. State,* 362 Md. 407, 414, 765 A.2d 612, 615 (2001); *In re Tariq A–R–Y,* 347 Md. 484, 489, 701 A.2d 691, 693 (1997)).

 In determining whether there was custody for purposes of *Miranda,* we accept the trial court's findings of fact unless clearly erroneous. *McAvoy v. State,* 314 Md. 509, 514–15, 551 A.2d 875, 877 (1989). "We must, however, make an independent constitutional appraisal of the record to determine the correctness of the trial judge's decision concerning custody." *Id.* at 515, 551 A.2d at 878.

## III. Discussion

Over twenty years ago, this Court explained that, "[a] determination of whether custodial questioning has occurred

requires, in the first instance, a finding that the defendant was in 'custody,' as that term is defined in the *Miranda* opinion." *Whitfield v. State,* 287 Md. 124, 137–38, 411 A.2d 415, 423–24 (1980). The *Miranda* opinion, however, gave little guidance as to what it meant by "custody," only cryptically stating that "custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). Consequently, as Judge Digges, speaking for the Court, observed in *Whitfield,* the determination of whether there has been "custodial interrogation" has "been described as 'probably the most difficult and frequently raised question in the wake of *Miranda.*" *Id.* at 126, 411 A.2d at 417 (quoting Kamisar, *"Custodial Interrogation" within the meaning of Miranda, Criminal Law and the Constitution: Sources and Commentaries* 335 (1968)).

Turning to face that task, the *Whitfield* Court reasoned that, "[d]eciding when a person has been significantly deprived of his freedom of action so as to be in custody within the meaning of *Miranda* depends on the factual setting surrounding the interrogation in each case." *Id.* at 139, 411 A.2d at 424. "The majority of courts which have explicitly addressed this question," we noted, "have adopted an objective reasonable person approach to determining custody." *Id.* at 139, 411 A.2d at 425 (citations omitted). As to that approach, we explained that

> custody occurs if a suspect is led to believe, as a reasonable person, that he is being deprived or restricted of his freedom of action or movement under pressures of official authority.
>
> \* \* \*
>
> [T]he custody requirement of *Miranda* does not depend on the subjective intent of the law enforcement officer-interrogator but upon whether the suspect is physically deprived of his freedom of action *in any significant way* or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation.

Id. at 140, 411 A.2d at 425 (quoting *Myers v. State,* 3 Md.App. 534, 537, 240 A.2d 288, 290 (1968))(emphasis added). We further stated that

> in the absence of actual arrest, 'custody for purposes of *Miranda* occurs when something [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.

Id. at 140–41, 411 A.2d at 425 (quoting *United States v. Hall,* 421 F.2d 540, 545 (2d Cir.1969)). "[S]ome actual indication of custody must exist, such that a reasonable person would feel he was not free to leave and break off police questioning." *Id.* at 141, 411 A.2d at 425. We then set forth factors that may be relevant to a determination of custody for purposes of *Miranda,* stating that a court should consider

> those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Id.* (quoting *Hunter v. State,* 590 P.2d 888, 895 (Alaska 1979)).

Since *Miranda,* and since our opinion in *Whitfield,* the Supreme Court has refined what it meant by "custody." In *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279 (1983), the Supreme Court stated

that, "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (per curiam)(quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977)). Seven years later, in *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 335 (1984), the Court declared, "It is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " (quoting *Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520, 77 L.Ed.2d at 1279.) The court also emphasized that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 442, 104 S.Ct. at 3151, 82 L.Ed.2d at 336. That definition of custody was reiterated by the Court in *Stansbury v. California,* 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam), where it explained, in language echoing that of *Beheler,* that "[i]n determining whether an individual [is] in custody, a court must examine all of the circumstances surrounding the inter-rogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " *Id.* at 322, 114 S.Ct. at 1528–29, 128 L.Ed 2d at 298. Further, the Court reemphasized that the "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* at 323, 114 S.Ct. at 1529, 128 L.Ed.2d at 298. Review of the objective circumstances to determine custody was reinforced as recently as 1995 when the Court decided *Thompson v. Keohane,* 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), in which Justice Ginsburg speaking for the Court stated:

Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interro-gation; and second, given those circumstances, would a

reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, *the court must apply an objective test to resolve "the ultimate inquiry:" "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."*

*Id.* at 112, 116 S.Ct. at 465, 133 L.Ed.2d at 394 (footnote and citations omitted)(emphasis added).

As a result of the Supreme Court's refinement of the definition of custody, subsequent cases from other state courts of last resort have iterated that custody exists when there is a " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *See, e.g., State v. Spreitz,* 190 Ariz. 129, 945 P.2d 1260, 1274 (1997); *Fairchild v. State,* 349 Ark. 147, 76 S.W.3d 884, 890 (2002); *People v. Ochoa,* 19 Cal.4th 353, 79 Cal.Rptr.2d 408, 966 P.2d 442, 470 (1998); *People v. Mangum,* 48 P.3d 568, 571 (Colo.2002); *State v. Pinder,* 250 Conn. 385, 736 A.2d 857, 872 (1999); *Resper v. United States,* 793 A.2d 450, 456 (D.C.2002); *Ramirez v. State,* 739 So.2d 568, 573 (Fla.1999); *Cook v. State,* 274 Ga. 891, 561 S.E.2d 407, 411 (2002); *State v. Ketchum,* 97 Hawai'i 107, 34 P.3d 1006, 1023 (2001); *State v. Doe,* 137 Idaho 519, 50 P.3d 1014, 1018 (2002); *Loving v. State,* 647 N.E.2d 1123, 1125 (Ind.1995); *In re J.D.F.,* 553 N.W.2d 585, 588 (Iowa 1996); *State v. Maise,* 805 So.2d 1141, 1149–50 (La.2002); *State v. Higgins,* 796 A.2d 50, 54 (Me.2002); *Commonwealth v. Sparks,* 433 Mass. 654, 746 N.E.2d 133, 136 (2001); *State v. Wiernasz,* 584 N.W.2d 1, 3 (Minn.1998); *State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, 405 (1997); *State v. Sabinash,* 574 N.W.2d 827, 830 (N.D.1998); *State v. Biros,* 78 Ohio St.3d 426, 678 N.E.2d 891, 904 (1997); *State v. Edwards,* 810 A.2d 226, 240 (R.I.2002); *State v. Hoadley,* 651 N.W.2d 249, 256 (S.D. 2002); *State v. Munn,* 56 S.W.3d 486, 498 (Tenn.2001); *State v. Mirquet,* 914 P.2d 1144, 1146 (Utah 1996); *State v. Willis,* 145 Vt. 459, 494 A.2d 108, 117 (1985); *State v. Post,* 118 Wash.2d 596, 826 P.2d 172, 178 (1992); *State v. George,* 185

W.Va. 539, 408 S.E.2d 291, 297 (1991); *State v. Swanson,* 164 Wis.2d 437, 475 N.W.2d 148, 153 (1991).

In the present case, the question, then, is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest in the situation before us. The State contends Rucker was not in custody, and in support of that contention, argues that Rucker was detained pursuant to a routine *Terry* stop, and that the stop, contrary to the decision of the Court of Special Appeals, did not develop into a *"de facto"* arrest. Rucker counters by arguing that the police were not justified in making the stop because they lacked reasonable suspicion. Even if the stop was justified, however, Rucker claims that he still was in custody for purposes of *Miranda* and, therefore, was entitled to the safeguards prescribed by that case.

For the reasons discussed hereinafter, we conclude that under the circumstances of this case, the stop of Rucker was a brief investigatory stop and had remained so when Rucker told the police that he had cocaine. Rucker was not in custody for purposes of *Miranda* because he was not restrained to a degree associated with a formal arrest. Accordingly, *Miranda* warnings were not required before the police asked Rucker whether he had anything illegal.

█ Rucker's contention that the police lacked reasonable suspicion to stop him, is without merit. In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court established that police may conduct brief investigatory stops if "there is a reasonable and articulable suspicion that the person is involved in criminal activity." *Nathan v. State,* 370 Md. 648, 660, 805 A.2d 1086, 1093 (2002). Reasonable suspicion is an elusive concept; the Supreme Court "has deliberately avoided reducing it to a uniform set of legal rules." *Id.* at 663, 805 A.2d at 1095 (citing *United States v. Arvizu,* 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). What is clear, however, is that although it is "a less demanding standard than probable cause," *Id.* (quoting *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 675–76, 145

L.Ed.2d 570, 576 (2000)); *see also David S.,* 367 Md. at 532, 789 A.2d at 612 (reasonable suspicion is "a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act")(quoting, *Stokes,* 362 Md. at 415, 765 A.2d at 616), a stop can be considered a *Terry* stop even if the information the police have could more than satisfy the standard of reasonable suspicion. *See United States v. Trueber,* 238 F.3d 79, 92 (1st Cir.2001)(rejecting district court's conclusion that a stop was not a valid *Terry* stop because officers had probable cause to arrest defendant and must have intended to do so).

 What is also clear is that reasonable suspicion may arise from information provided by an informant. *See, e.g., Florida v. J.L.,* 529 U.S. 266, 274, 120 S.Ct. 1375, 1380, 146 L.Ed.2d 254, 262 (2000); *Alabama v. White,* 496 U.S. 325, 332, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301, 310 (1990); *Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612, 617 (1972); *Cartnail v. State,* 359 Md. 272, 289, 753 A.2d 519, 528 (2000); *State v. Lemmon,* 318 Md. 365, 379, 568 A.2d 48, 56 (1990); *Quince v. State,* 319 Md. 430, 437, 572 A.2d 1086, 1089 (1990); *Lee v. State,* 311 Md. 642, 657, 537 A.2d 235, 242 (1988); *Watkins v. State,* 288 Md. 597, 608, 420 A.2d 270, 276 (1980). Information furnished by an informant must be sufficiently reliable in order to provide reasonable suspicion justifying an investigatory stop. *White,* 496 U.S. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d at 309. In determining reliability, we look at the "totality of the circumstances." *White,* 496 U.S. at 328, 110 S.Ct. at 2415, 110 L.Ed.2d at 308 (quoting *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)(adopting *Gates* ' "totality of circumstances" test for reasonable suspicion analysis even though *Gates* dealt with whether tip provided probable cause to support search warrant)); *Lemmon,* 318 Md. at 379, 568 A.2d at 55; *Lee,* 311 Md. at 654–55, 537 A.2d at 240. In looking at the totality of the circumstances, we consider an informant's "veracity, reliability," and his or her "basis of knowledge." *White,* 496 U.S. at 328, 110 S.Ct. at 2415, 110 L.Ed.2d at 308 (citing *Gates,* 462 U.S. at 230, 103 S.Ct. at 2328, 76 L.Ed.2d at 543). Rather

than being treated independently, these factors must be viewed as interacting components in the totality of the circumstances analysis: "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Gates*, 462 U.S. at 233, 103 S.Ct. at 2329, 76 L.Ed.2d at 545.

■ Rucker contends that the tip in the instant case failed to provide police with reasonable suspicion because there was no evidence as to the source's basis of knowledge, reliability or veracity. In support of that contention, Rucker points out that the source had not provided information to the police in the past, and asserts that the police's corroboration of the details of the tip failed to exhibit sufficient indicia of reliability because the verified information was "commonly available to any number of persons." Rucker's arguments are without merit. That the source had not provided police with information in the past is offset by the fact that the source was known to the police, and by the quantity and quality of details provided by the informant's tip, many of which were later verified by police.

■ Whether a source is known to police or not is highly probative in determining whether the tip provided by the source is reliable enough to amount to reasonable suspicion. *Florida v. J.L.*, 529 U.S. at 270, 120 S.Ct. at 1378, 146 L.Ed.2d at 260; ("Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated ... an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.") (citations and internal quotations omitted). The source in the instant case was not anonymous; the source actually went with the police to the shopping center when they stopped Rucker.

■ Also important in determining the reliability of a tip is the amount and type of details provided therein. *White*, 496 U.S. at 328–32, 110 S.Ct. at 2415–17, 110 L.Ed.2d at 308–10 (concluding that anonymous tip provided reasonable suspicion,

noting the high level of details in tip, later verified by police, as well as predictive nature of details); *Gates*, 462 U.S. at 242–46, 103 S.Ct. at 2334–36, 76 L.Ed.2d at 550–53 (stating that the level of detail in an anonymous letter, later verified by police, as well as the fact that the details pertained to future actions not easily predicted, provided probable cause to support a search warrant); *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327, 332 (1959)(stating that warrantless search and seizure was legal because when officer had verified most details provided by informant, officer "had 'reasonable grounds' to believe that the remaining unverified bit of [the informant's] information—that [the defendant] would have the heroin with him—was likewise true"); *Lee*, 311 Md. at 655, 537 A.2d at 241 (determining that information from anonymous source provided reasonable suspicion, and in doing so, reasoning that a "good deal of specific information [was] reported to police," which they were able to verify, and that the information related to "future actions of third parties"). In the instant case the source gave very detailed information. With respect to Rucker's physical appearance, the source told police that he was "dark complected, about six foot tall, a hundred and eighty-five pounds, [with] a short hair cut." The source also told Detective Powell that Rucker "owned a burgundy Tahoe" and provided the detective with "a partial tag of the Tahoe." In addition, the source told Detective Powell that on January 2, 2001, Rucker would be at a shopping center in Forestville at 5:20 in the evening, that he would be driving the burgundy Tahoe, and that he would be carrying "a quantity of crack cocaine." The detail here is further compelling because it is predictive, and thus, contrary to Rucker's assertion, the fact that Rucker would be at a specific shopping center parking lot on a particular day and at a particular time in the future, is not information that would be commonly known to a number of people. Thus, in light of the totality of the circumstances, we conclude that the information provided by the confidential source was sufficiently reliable so as to provide the police with reasonable suspicion to stop Rucker.

The Court of Special Appeals, however, found that the scope of the stop was unreasonable and, therefore, had become a *"de facto* arrest." The State contends that the intermediate appellate court erred in so concluding, and argues that the court's decision should be "summarily reversed in light of [our] opinion in *In re David S.*, 367 Md. 523, 789 A.2d 607 (2002)." We agree that the Court of Special Appeals erred in concluding that Rucker was subjected to a *"de facto"* arrest, but not necessarily because of our decision in *In re David S.*

In that case, "several police officers conducted a 'hard take down' " of David. S. *Id.* at 539, 789 A.2d at 616. "The officers, with their weapons drawn, forced respondent to the ground and placed him in handcuffs." *Id.* They did so because one of the officers had previously observed David S. place an object into his waistband that the officer suspected was a gun. *Id.* Under those circumstances, we held that "the stop was a legitimate *Terry* stop, not tantamount to an arrest." *Id.* We explained that although the officer's conduct was a "severe form of intrusion," it was "not unreasonable because the officers reasonably could have suspected the respondent posed a threat to their safety." *Id.* at 539–40, 789 A.2d at 616. The State asserts that in light of the "severe form of intrusion" that we allowed in *David S.*, the circumstances of the present case surely did not amount to an arrest. The facts of *David S.* are inapposite, however.

The only reason we found the detention in *David S.* "not unreasonable" was because the police believed that David S. had a gun in his waistband. *id.* at 539, 789 A.2d at 616. Balancing "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion," we concluded that the hard take down was warranted in order to protect the officers' safety. *Id.* at 533, 539, 789 A.2d at 612–13, 616 (quoting, *United States v. Hensley,* 469 U.S. 221, 228, 105 S.Ct. 675, 680, 83 L.Ed.2d 604, 611–12 (1985)). Nonetheless, *David S.* is valuable to our analysis, because it discusses principles for determining whether a *Terry* stop has matured into an arrest.

In *David S.*, we stated that, "[i]n evaluating the reasonableness of a *Terry* stop, the Supreme Court adopted a dual inquiry: 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' " *Id.* at 532–33, 789 A.2d at 612. Further, "[i]n determining whether an investigatory stop is in actuality an arrest requiring probable cause, courts consider the 'totality of the circumstances.' " *Id.* at 535, 789 A.2d at 614. In so doing, "no one factor is dispositive." *Id.* The stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 533, 789 A.2d at 612.

The officers in the instant case stopped Rucker and asked him whether he had anything illegal after learning from a confidential source that Rucker would be at a shopping center parking lot at 5:20 p.m. on January 2, 2001, that he would be driving a burgundy Tahoe, and that he would be carrying cocaine. One officer parked his cruiser behind Rucker's vehicle and asked Rucker for his license and registration. Moments later, two detectives approached, one of whom asked a single question, namely, whether Rucker had anything that he should not have. Contrary to the conclusion of the Court of Special Appeals, these circumstances did not amount to an arrest. Rather, the conduct of the officers in effectuating the stop was "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* They stopped Rucker to determine whether he had cocaine, and there was nothing unreasonable about the way in which they did so. Thus, Rucker's detention began as a brief investigatory stop, and remained so when Rucker admitted to having cocaine.

Our inquiry, however, is not at an end, for Rucker contends that even if his detention amounted only to a brief, investigatory stop, he was still entitled to *Miranda* warnings. In support of that contention, Rucker maintains that a person may be in custody for purposes of *Miranda* even though the person has not been arrested. This is so, according to Rucker,

because the distinction between a "brief, investigatory stop" and an "arrest" under the Fourth Amendment turns on the reasonableness of police conduct in light of all the circumstances, whereas a custody determination for purposes of *Miranda* focuses on how a reasonable person in the suspect's position would have understood his or her situation. We have determined, however, that Rucker's detention, before he admitted to having cocaine, amounted to nothing more than a brief, investigatory stop. The Supreme Court, and this Court, have declared that brief, investigatory stops are not custodial for purposes of *Miranda*.

In *Berkemer*, the Supreme Court concluded that a "routine traffic" stop, because it is more like a *Terry* stop than an arrest, does not require *Miranda* warnings. 468 U.S. at 440, 104 S.Ct. at 3150, 82 L.Ed.2d at 334–35. In so concluding, the Court reasoned that traffic stops, are "presumptively temporary and brief," *id.* at 437, 104 S.Ct. at 3149, 82 L.Ed.2d at 333, and that the "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." *Id.* at 438, 104 S.Ct. at 3149, 82 L.Ed.2d at 333. Although there is still an "aura of authority" during a traffic stop, the Court found that that aura is diffused because, "most importantly, the typical traffic stop is public." *Id.* at 438, 104 S.Ct. at 3149, 82 L.Ed.2d at 334. "This exposure to public view," the Court explained, "both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse." *Id.* Thus, the Court concluded that "the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself ... and in the subsequent cases in which we have applied *Miranda*." *Id.* at 438–39, 104 S.Ct. at 3149–50, 82 L.Ed.2d at 334. The Court, however, did qualify its conclusion that brief investigatory stops do not require *Miranda* warnings, stating that, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in

custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda.*" *Id.* at 440, 104 S.Ct. at 3150, 82 L.Ed.2d at 335. In making the custody determination, the Court reiterated that the proper inquiry is whether there was a restraint on freedom of movement to a degree associated with a formal arrest, and that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 441–42, 104 S.Ct. at 3151, 82 L.Ed.2d at 336.

Various federal courts, both before and after *Berkemer* was decided, have concluded that brief investigatory detentions similar to the detention in the instant case do not constitute custody for purposes of *Miranda. See, e.g., United States v. Jones,* 187 F.3d 210, 218–19 (1st Cir.1999)(holding that officers' stop of defendants, based on tip and personal observations, was not custodial as it occurred on public highway, only one officer questioned each of the defendants, no physical restraint was used, the stop was brief, and the questions asked were few and specifically directed to the justification for making the stop); *United States v. Wyatt,* 179 F.3d 532, 536–37 (7th Cir.1999)(declining to find custody when, based on tip and independent investigation, officers identified bank robbery suspect in bar and asked suspect to step outside where he was questioned and frisked in well-lit public area with no use of physical restraint); *United States v. Guerrero–Hernandez,* 95 F.3d 983, 986 (10th Cir.1996)(holding there was no custody when INS agents, during course of investigation to find illegal aliens, sought, encountered, and questioned defendant "outdoors, in a public place, without displaying firearms"); *United States v. Grady,* 665 F.2d 831, 833–34 (8th Cir.1981)(holding there was no custody when officer asked defendant in liquor store to accompany officer to parking lot and asked him if counterfeit bills belonged to him).

In light of the teachings of *Berkemer,* this Court decided in *McAvoy,* that the defendant was not entitled to *Miranda* warnings prior to being asked to perform field sobriety tests after a traffic stop. 314 Md. at 510, 551 A.2d at 875. In that case, a Maryland State Trooper was forced off the road at

night when the defendant, while turning onto the road at an intersection, swept into the Trooper's lane. *Id.* at 510–11, 551 A.2d at 875. After stopping the defendant, the Trooper asked him if he was aware of the sign at the intersection prohibiting right turns on red. *Id.* at 511, 551 A.2d at 875–76. Because the defendant insisted there was no such sign, the Trooper suggested that they return to the intersection, and both did so driving their respective vehicles. *Id.* at 511, 551 A.2d at 876. Once there, as they were parked in a lighted parking lot, the Trooper noticed the defendant had watery eyes, a flush complexion, and the odor of alcohol on his breath. *Id.* Consequently, he asked the defendant to perform some field sobriety tests. After failing those tests, the Trooper placed the defendant under arrest for driving while intoxicated. *Id.* The Circuit Court denied the defendant's motion to suppress; he was convicted of driving under the influence of alcohol. *Id.* at 513, 551 A.2d at 877. The Court of Special Appeals affirmed, and so did we. *Id.*

Relying on the Supreme Court's decision in *Berkemer*, we declared that the circumstances surrounding the defendant's traffic stop, "were not of a kind likely to exert pressure upon McAvoy sufficient to impair his free exercise of his privilege against self-incrimination." *Id.* at 516, 551 A.2d at 878. Although the stop in *McAvoy* was of a longer duration, we reasoned that it was still "brief and non-threatening." *Id.* We paid particular note to the facts that the defendant returned to the intersection in his own car, that the parking lot was open to the public, and that it was well lit. *Id.* at 516–17, 551 A.2d at 878; *see also Jones v. State,* 132 Md.App. 657, 666–72, 753 A.2d 587, 592–95 (2000)(discussing *Berkemer* and concluding that questioning during brief investigative stop on public street while potential eyewitness brought to scene not custodial for purposes of *Miranda* ).

 The circumstances of the instant case were no more coercive. Rucker was subjected to a brief investigatory stop; his freedom of movement was not curtailed to a degree associated with a formal arrest. Rucker was not isolated in a

police-dominated atmosphere when he was questioned by police. Indeed, it was 5:20 in the evening in the public parking lot of a local shopping center. Additionally, the detention was brief. According to Detective Powell, the entire incident, beginning when the detectives picked up the informant and ending when Rucker gave his statement, lasted less than one hour. There were three officers on the scene, but Corporal Grimes stepped away from Rucker when Detectives Powell and Piazza approached. Although the Corporal did take Rucker's license and registration, their return was not conditioned upon Rucker's cooperation with the police, and no officer ever told Rucker that he would not return the documents. Further, of the three officers, only one of them asked Rucker a single question before he admitted to having cocaine, namely, whether he had anything that he should not have. Moreover, no officer drew any weapons, and Rucker was not handcuffed or actually physically restrained until after he admitted to having cocaine.

Consequently, Rucker's detention was more like a routine traffic stop than an arrest, and after the stop, he was not, as stated by the Supreme Court in *Berkemer*, "subjected to treatment that render[ed] him 'in custody' for practical purposes," which would have "entitled him to the full panoply of protections prescribed by *Miranda*." 468 U.S. at 440, 104 S.Ct. at 3150, 82 L.Ed.2d at 335. Indeed, the question asked of him was no more coercive than asking a motorist whether he or she has been drinking or is in possession of weapons or drugs, which are permissible to ask without *Miranda* warnings. *See McAvoy*, 314 Md. at 510, 551 A.2d at 875. Moreover, other jurisdictions have declined to find "custody" for purposes of *Miranda* when, like here, a brief, investigatory stop is conducted in a public place.

Thus, under the circumstances of this case, we conclude that Rucker was not entitled to *Miranda* warnings when he was stopped and questioned.

***JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT***

*WITH INSTRUCTIONS TO REVERSE THE ORDER OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY GRANTING RESPONDENT'S MOTION TO SUPPRESS, AND TO REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.*

Dissenting Opinion by BELL, C.J., in which ELDRIDGE, J., joins.

The majority errs in the case *sub judice* because it does not give the proper amount of deference to the trial court's determination, inherently fact-based, appropriately affirmed by the Court of Special Appeals,[1] that, when questioned by the

---

1. The Court of Special Appeals did not agree entirely with the trial court's reasoning, however. In its unreported opinion, the intermediate appellate court held that, although the initial stop was based on "a reasonable articulable suspicion" and, thus, pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "the events in the shopping mall parking lot exceeded an investigatory stop under *Terry*, and became the functional equivalent to a *de facto* arrest," requiring that the warnings prescribed in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) be given before questioning of the respondent began. By contrast, the trial court concluded that "there was no basis for Detective Powell to go up to the defendant's person and start making inquiry without first mirandizing him." This conclusion was based on the following factual findings:

 "Detective Grimes was not involved in the case directly. He was summonsed to the scene to go ahead and make a stop.... I use the word stop because that's what happened: he confronted Mr. Rucker as Mr. Rucker was getting into his vehicle, asked him to basically step outside, regardless of how it's stated, provide license and registration. And as Detective Powell testified, that was apparently being done when Detective Powell approached the defendant. Detective Rucker we know-or Detective Powell has testified, as did Officer Grimes, that Officer Grimes was in uniform at the time and clearly one can assume, although its not testified to, that he was armed at the time, albeit, we know nobody had drawn a weapon.

 "While Detective—Officer Grimes had the defendant in his presence, Detective Powell approached the defendant, and at this point in time says something to the effect do you have something on your person that you're not supposed to, at which point in time the defendant says yes. And we know from this point, forward the

police, Terrence Michael Rucker, the respondent, had been detained, was in custody, which detention "for all intents and purposes" was "an arrest." Instead, the majority substitutes its judgment for that of the trial court and "finds" that no custodial interrogation took place warranting the giving of *Miranda* warnings. Moreover, of great significance to it is the fact that the respondent's incriminatory admission was in response to a single question asked by one of the detectives during a "*Terry* stop." Thus, the majority "hold[s] that Rucker was not in custody for purposes of *Miranda* when he was stopped and questioned in the shopping center parking lot and so was not entitled to the procedural warnings prescribed by that case." *State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439, 443 (2003). Viewed in their entirety, and in context, I am satisfied that the events that occurred in the parking lot of the shopping mall, and especially the manner in which the stop was orchestrated and effected, did far exceed an investigatory *Terry* stop. Thus, I agree with the trial court and the intermediate appellate court, the evidence seized from the respondent must be suppressed.[2] Accordingly, I dissent

## I.

As the majority correctly points out, an appellate court's review of an order granting a motion to suppress evidence ordinarily is "limited to the evidence presented at the suppression hearing." *See* 374 Md. at 207, 821 A.2d at 443, (quoting *Carter v. State*, 367 Md. 447, 457, 788 A.2d 646, 651 (2002), which in turn cited *Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491, 497 (1999)). And, while, as the majority points out, *id.* at

---

 defendant's person was seized after he confided that he had cocaine on his person."
Thus, the intermediate appellate court and the trial court agreed on the issue of whether there was an arrest.

**2.** The State conceded at the suppression hearing that there was nothing that the respondent did or said that elevated the reasonable and articulable suspicion to probable cause. In fact, the State admits that the respondent's incriminatory statement is the sole basis for his arrest and subsequent search.

207, 821 A.2d at 444, "[w]e make an independent constitutional evaluation by reviewing the relevant law and applying it to the unique facts and circumstances of the case," *Carter*, 367 Md. at 457, 788 A.2d at 651 (citing *Wilkes v. State*, 364 Md. 554, 569, 774 A.2d 420, 429 (2001); *Stokes v. State*, 362 Md. 407, 414, 765 A.2d 612, 615 (2001); *In re Tariq A–R–Y*, 347 Md. 484, 489, 701 A.2d 691, 693 (1997)), as the majority further acknowledges, "we pay deference to the trial court's factual findings, upholding them unless 'they are clearly erroneous.' " *Id., citing Carter v. State*, 367 Md. at 457, 788 A.2d at 651–652. Furthermore, we are required to view the evidence and the inferences that reasonably may be drawn therefrom in the light most favorable to the prevailing party on the motion. *Id., citing Cartnail v. State*, 359 Md. 272, 282, 753 A.2d 519, 524 (2000). As I shall demonstrate, the majority all but disregards these principles in practice; it pays only lip service to them in deciding this case.

*Miranda* warnings need not be given before asking the defendant any questions unless the defendant is in custody. In *Miranda*, the Court characterized "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). Thus, the threshold inquiry, and determination, in every case involving the issue of the propriety of giving or not giving *Miranda* warnings is whether there was, in that case, a custodial interrogation. *Whitfield v. State*, 287 Md. 124, 137–38, 411 A.2d 415, 423–24 (1980). "[T]he inquiry," we have said, "is a highly fact-specific one," *Ferris v. State*, 355 Md. 356, 377, 735 A.2d 491, 502 (1999), and the test, an objective one, involves assessing the totality of the circumstances of an encounter or interrogation from the perspective of a reasonable person. *Id.* at 376, 735 A.2d at 501; *Whitfield*, 287 Md. at 139, 411 A.2d at 425. Factors that may be probative when applying the test in the context of the case *sub judice* were recently identified and discussed in *Ferris:*

"the time and place of the encounter, the number of officers present and whether they were uniformed, whether the police removed the person to a different location or isolated him or her from others, whether the person was informed that he or she was free to leave, whether the police indicated that the person was suspected of a crime, whether the police retained the person's documents, and whether the police exhibited threatening behavior or physical contact that would suggest to a reasonable person that he or she was not free to leave."

355 Md. at 377, 735 A.2d at 502, citing *United States v. McCarthur*, 6 F.3d 1270, 1275–76 (7th Cir.1993); *United States v. Gray*, 883 F.2d 320, 322 (4th Cir.1989).

To be sure, as we acknowledged in *Ferris*, 355 Md. at 374, 735 A.2d at 500, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). On the other hand, *Bostick* recognizes, *id.* at 437, 111 S.Ct. at 2387, 115 L.Ed.2d at 400, as have we, that "[i]f the police, in some way, communicate to a reasonable person that he or she was not free to ignore the police presence and go about their business, then the Fourth Amendment is implicated." *Ferris*, 355 Md. at 375, 735 A.2d at 501. We have explained:

"A seizure can occur by means of physical force, or show of authority along with submission to the assertion of authority. [*California v.*] *Hodari D.*, 499 U.S. [621,] 625–26, 111 S.Ct. [1547,]1550 [,113 L.Ed.2d 690, 696–697 (1991)] (noting that police officers could affect a seizure of a person by either physical force or by a show of authority along with submission to the assertion of authority); *see Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968) ('Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a " 'seizure' has occurred.' "). If a reasonable person would have felt free to leave, no seizure occurred. Conversely, if a reasonable person would have felt compelled to stay, a seizure took

place. The focus, then, is 'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.' *Bostick,* 501 U.S. at 436, 111 S.Ct. at 2387. The key inquiry has also been characterized as whether 'the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Id.* at 437, 111 S.Ct. at 2387 (quoting *Michigan v. Chesternut,* 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988))."

*Id.* at 375–76, 735 A.2d at 501. We made a similar point, albeit under quite different circumstances, in *Whitfield.* In that case, we observed that custody for *Miranda* purposes exists: " '[i]n the absence of actual arrest, [when] something [is] said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.' " 287 Md. at 140–41, 411 A.2d at 425, quoting *United States v. Hall,* 421 F.2d 540, 545 (2d Cir.1969).

Detectives Powell and Piazza, having come to the shopping mall parking lot where the respondent was, and his vehicle parked, and rather than stopping the respondent themselves, summonsed a uniformed officer who was in the vicinity in his patrol car, and had him to do so. The manner in which that officer made the stop and the detectives' subsequent appearance and involvement are quite telling and instructive. The uniformed officer, Corporal Grimes, parked his patrol car behind the respondent's vehicle. As the respondent was about to get into the driver's side of his vehicle, Corporal Grimes called to him to get his attention and then walked up to him, demanding the respondent's license and registration. Naturally wanting to know why a uniformed officer would demand his license and registration when he was not operating the vehicle, the respondent responded, "what's going on." Rather than respond to that reasonable question, the Corporal simply repeated the prior demand. The respondent gave the corporal his license and registration. After Corporal Grimes had the respondent's license and registration, Detectives Powell

and Piazza came on the scene. Detective Powell "walked right up" to within two feet of Rucker "and started asking him questions," while Detective Piazza, "maybe a step behind" Detective Powell remained in the immediate area, as did Corporal Grimes. It was under these circumstances that the respondent responded to Detective Powell's inquiry whether "he had anything that he was not supposed to have," with an incriminating, "yes, I do, it's in my pocket," later identifying "it" as cocaine.

Having heard the testimony and having had the opportunity to assess the witnesses' credibility, the trial judge found:

"Detective Grimes was not involved in the case directly. He was summonsed to the scene to go ahead and make a stop. . . . I use the word stop because that's what happened: he confronted Mr. Rucker as Mr. Rucker was getting into his vehicle, asked him to basically step outside, regardless of how it's stated, provide license and registration. And as Detective Powell testified, that was apparently being done when Detective Powell approached the defendant. Detective Rucker we know-or Detective Powell has testified, as did Officer Grimes, that Officer Grimes was in uniform at the time and clearly one can assume, although its not testified to, that he was armed at the time, albeit, we know nobody had drawn a weapon.

"While Detective—Officer Grimes had the defendant in his presence, Detective Powell approached the defendant, and at this point in time says something to the effect do you have something on your person that you're not suppose to, at which point in time the defendant says yes. And we know from this point, forward the defendant's person was seized after he confided that he had cocaine on his person."

As we have seen, the trial judge concluded that the respondent had been, for all intents and purposes, arrested. In short, the court determined that the respondent was in custody when Detective Powell asked the question that elicited the incriminatory response. The Court of Special Appeals essen-

tially agreed, quibbling only with whether a stop, properly limited and effected, could have been made.

Whether a suspect is in custody, has been arrested or subjected to a *de facto* arrest is inherently a question of fact, properly decided by the trial court. In *McAvoy v. State*, 314 Md. 509, 551 A.2d 875 (1989), the issue, raised at the suppression hearing, was whether *Miranda* warnings were required to be given to a drunk driving defendant before he was asked to perform field sobriety tests. *Id.* at 510, 551 A.2d at 875. We accepted the finding of the trial judge that the defendant was not "in custody" for purposes of *Miranda* when the tests were conducted, noting that the trial court heard conflicting testimony bearing on the issue, resolving the conflicts in that testimony in favor of the State. *Id.* at 514, 551 A.2d at 877. This was required by well settled principles: the credibility of a witness is primarily for the trier of fact to decide, and findings of fact of a trial judge are accepted unless clearly erroneous. *Id.* at 514–515, 551 A.2d at 877, citing Maryland Rule 8–131(c).[3] We recognized, however, citing *In Re Anthony F.*, 293 Md. 146, 152, 442 A.2d 975, 979 (1982), that "*[a]rmed with the facts properly found by the trial judge*, we must . . . make an independent constitutional appraisal of the record to determine the correctness of the trial judge's decision concerning custody." *McAvoy, supra*, 314 Md. at 515, 551 A.2d at 877–878 (emphasis added)." The majority agrees with the *McAvoy* approach, indeed, relies on it, having cited to that case with approval, on this very point.

In the instant case, whether the respondent was in custody when he made the incriminatory remark was the critical issue to be decided at the suppression hearing. Detective Powell and Corporal Grimes testified at that suppression hearing. In

---

3. Maryland Rule 8–131(c) provides

"(c) Action Tried Without a Jury. When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgement of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of witnesses."

this case, because there was no actual arrest until after the recovery of the cocaine, the question to be answered was whether the circumstances were such that a reasonable person would have felt that he or she was in custody. After, evaluating the testimony adduced at the hearing, the trial judge found that the respondent was in custody, thus either rejecting that which supported that he was not or drawing inferences from the evidence that supported the factual conclusion that the trial judge made. Put another way, the trial judge found that the officers' conduct in the parking lot exceeded the scope of an investigatory stop under *Terry*, and was, in actuality, a *de facto* arrest, thus triggering the respondent's entitlement to *Miranda* warnings. The trial court's determination is entitled to deference and, in any event, should not easily be ignored.

Although it professes to do so, the majority fails to accept the trial court's findings of fact and, in fact, views the sequence of events surrounding the respondent's arrest quite differently than did the trial court. As characterized by the majority, the police-respondent encounter was not at all coercive:

"Rucker was subjected to a brief investigatory stop; his freedom of movement was not curtailed to a degree associated with a formal arrest. Rucker was not isolated in a police-dominated atmosphere when he was questioned by police. Indeed, it was 5:20 in the evening in the public parking lot of a local shopping center. Additionally, the detention was brief. According to Detective Powell, the entire incident, beginning when the detectives picked up the informant and ending when Rucker gave his statement, lasted less than one hour. There were three officers on the scene, but Corporal Grimes stepped away from Rucker when Detectives Powell and Piazza approached. Although the Corporal did take Rucker's license and registration, their return was not conditioned upon Rucker's cooperation with the police, and no officer ever told Rucker that he would not return the documents. Further, of the three officers, only one of them asked Rucker a single question

before he admitted to having cocaine, namely, whether he had anything that he should not have. Moreover, no officer drew any weapons, and Rucker was not handcuffed or actually physically restrained until after he admitted to having cocaine."

374 Md. at 220–21, 821 A.2d at 452. According to the majority, therefore:

"Rucker's detention was more like a routine traffic stop than an arrest,[4] and after the stop he was not, as stated by the Supreme Court in [*Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ], 'subjected to treatment that render[ed] him "in custody" for practical purposes,' which would have 'entitled him to the full panoply of protections prescribed by *Miranda*.' Indeed, the question asked of him was no more coercive than asking a motorist whether he or she has been drinking or is in possession of weapons or drugs, which are permissible to ask without *Miranda* warnings."

Id. at 221, 821 A.2d at 452 (citation omitted).

Thus, rather than as a demand, as the trial court undoubtedly construed it, the majority characterizes the directive from Corporal Grimes to the respondent as a request, a characterization that it continues to use even when Corporal Grimes utterly failed to respond to, and, in fact, ignored, the respondent's request for an explanation. The majority emphasizes that, when the police approached, no vehicle was occupying the space in front of the respondent's vehicle, that Detective Piazza, Detective Powell's partner, "had stepped away from Rucker," that, although uniformed and armed, Corporal Grimes' weapon was not drawn, and he "made no physical

---

4. Clearly, the stop of the respondent is distinguishable from a routine traffic stop. The respondent was stopped and ordered to produce identification before even entering, not to mention operating, his vehicle. His wanting to know what was going on was, therefore, understandable and required an answer. At least as important, routine traffic stops typically do not result in the arrival of plain clothed detectives, to whom the stopping officer defers upon their initiation of questioning.

contact with" the respondent and that "the entire incident . . . from the time we picked up the source" lasted no more than one hour. In addition, that the police had possession of the respondent's license and registration is deemed unimportant because, the majority surmises, there being no statement by the police to that effect, "their return was not conditioned upon Rucker's cooperation with the police, and no officer ever told Rucker that he would not return the documents." The majority, in other words, views the evidence in the light most favorable to the State, rather than the respondent, the prevailing party on the motion.

Notwithstanding that they are never determined to be clearly erroneous, the majority all but ignores, and certainly does not apply, the facts as found by the trial court, and undoubtedly critical to its determination that the stop was tantamount to an arrest: the respondent was stopped by a uniformed officer under orders from the detectives; his license and registration were in the possession of Corporal Grimes and, so, he was a captive; his vehicle was partially blocked by Corporal Grimes' police cruiser; his inquiry as to what was going on was ignored; he was "surrounded" by three police officers; and he was not told he was free to leave.

I think it is abundantly clear, having accepted and reviewed the facts found by the trial court and considering the totality of the circumstances, that the respondent never thought for a moment that he was free to leave or could refuse to answer Detective Powell's questions. Today's holding is yet one more step in the erosion of the right to be free from unlawful searches and seizures guaranteed by the Fourth Amendment and the Maryland Declaration of Rights. Over time, the gradual eroding of constitutional freedoms portend serious consequences for individual liberty. Over one-hundred years ago, Mr. Justice Bradley writing for the Court warned:

> "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the

rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more of sound than in substance. It is the duty of the courts to be watchful for the constitutional rights of the citizens, and against any stealthy encroachments thereon."

*Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746, 754 (1886).

Doing my part to prevent further erosion of those protections, I would affirm the judgment of the Court of Special Appeals, which affirmed the judgment of the Circuit Court for Prince George's County.

Judge ELDRIDGE joins in the views expressed herein.